**2016 UT App 135**

## THE UTAH COURT OF APPEALS

TERESA TAFT,
Appellant,
*v.*
MILTON LEE TAFT JR., GERALDINE POULSON TAFT,[1]
AND MILTON LEE TAFT III,
Appellees.

Opinion
No. 20140690-CA
Filed June 30, 2016

Sixth District Court, Loa Department
The Honorable Wallace A. Lee
Nos. 120600028, 094600018

Leslie W. Slaugh, Attorney for Appellant

Michael R. Labrum, Attorney for Appellees

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.

ROTH, Judge:

¶1      In this consolidated appeal, Teresa Taft (Wife) appeals
from a supplemental decree of divorce and judgment between
herself and Milton Lee Taft III (Husband), entered on September
16, 2014. We affirm in part and reverse in part and remand.

---

1. Husband's parents, Milton Lee Taft Jr. and Geraldine Poulson
Taft, are included because they were listed as defendants along
with Husband in a separate fraudulent transfer claim, case
number 120600028, which has been consolidated into this
appeal.

BACKGROUND

¶2    Husband and Wife married in June 1987, and the marriage ended with the entry of a bifurcated decree of divorce in December 2009. During twenty-two years of marriage, the parties built two businesses and acquired certain real property. In particular, Husband and Wife purchased property to build and operate Taft Travel Plaza (the Travel Plaza) in 1991. Initially the Travel Plaza consisted of a convenience store and a gas station, but it was later expanded to include a fast food restaurant and a five-unit strip mall of commercial rentals. In 2006, the couple separated. During the separation and prior to the divorce, Husband and his parents—Milton Lee Taft Jr. and Geraldine Poulson Taft—began Milton's South, Inc. (Milton's South), a business consisting of "an apartment, a business space, two separate large buildings of storage units, a 2-bay car wash, and a credit card fueling station." At the time of the divorce, Husband owned 33.4% of the stock in Milton's South, though by the time of trial, Husband had acquired full ownership of the corporation.

¶3    During the marriage, Husband primarily ran the businesses and Wife primarily took care of their four children, occasionally assisting with various tasks at the Travel Plaza as needed. The business assets and the real property acquired during the marriage were titled solely in Husband's name, though the parties understood that Wife had an interest in the property. Although the businesses were incorporated, Husband has consistently treated them as sole proprietorships, paying both business and personal expenses from the business accounts. In 2011, Wife decided to enroll in and attend graduate school at the University of Utah. As part of her graduate studies, Wife received a scholarship stipend, which must be annually renewed, that provided her with monthly income. In 2014, her stipend was $1,909 per month.

¶4 The 2009 bifurcated decree of divorce reserved child custody and support, alimony, and property issues for later resolution. At the time of the bifurcated decree, the parties "stipulated to temporary orders" that "required [Husband] to pay $3,500 per month to [Wife] for family support," but no agreement was reached regarding the parties' respective incomes. The temporary orders "reserved the right" for the parties to "retroactively adjust the support payment" once both parties' incomes became "fully established." However, the parties' incomes were not determined until trial.

¶5 In April 2011, Husband filed a motion for modification of the temporary support orders because he believed that he was "no longer able to pay the amount ordered" for family support. Husband identified the source of his financial difficulties as a faulty credit card reader at the Travel Plaza gas pumps, which resulted in "highly unusual business losses" for Husband during 2009 to 2010.[2] During this period of financial difficulty, Husband sold a twenty-acre parcel of land in Wayne County, Utah, on which he had built a golf course (the Sunglow Property). He had

---

2. In 2007, Husband had established a line of credit with his bank that would, among other things, allow him to purchase additional supplies of gasoline when the price fell during the wintertime. Husband would store the gasoline in tanks at his business locations and resell it in the summertime when prices were typically higher. Husband would then pay down the loan with the proceeds. However, Husband's accountant discovered in 2009 that even though the stored gasoline was being sold at a higher price than purchased, Husband was inexplicably losing money. It took some time to track the source of the loss to the faulty credit card reader, and by 2011, Husband had exhausted the line of credit and was unable to pay it back. It was during this time that Husband filed his motion to modify the temporary support orders.

originally purchased the land from his parents in October 2001 for $50,000. In 2011, however, in order to "pay down loans" and help secure "additional SBA business financing," Husband sold the parcel back to his father for $50,000.[3] After the sale, Husband continued to use the Sunglow Property in the same manner as he had before.

¶6     In January 2012, Wife filed a motion for an order to show cause, asking the trial court to hold Husband "in immediate contempt" and to award Wife delinquent support along with her attorney fees. The court issued an order to show cause in January 2012, and the case was scheduled for a hearing on that issue as well as Husband's motion for modification of temporary orders at the end of that month. The issues were not resolved at that hearing, and they were not raised again until trial.

¶7     The case went to trial in December 2013, and the court issued a memorandum decision in June 2014 wherein it ruled on child custody; child support; alimony; division of real and personal property, including the alleged fraudulent transfer of the Sunglow Property; the temporary support order; allocation of the parties' debts; and attorney fees. The court directed Husband's counsel "to draft the final documents necessary to implement the Court's decision." Wife filed a motion for reconsideration (the Motion to Reconsider) and objections to Husband's proposed findings of fact and conclusions of law (the Objections). On September 16, 2014, the trial court denied the Motion to Reconsider, overruled the Objections, and filed its supplemental findings of fact and conclusions of law and

---

3. Prior to the 2011 sale, the Sunglow Property, the Travel Plaza, and Milton's South were all encumbered as collateral for the same bank debt. But at the time of this sale, the bank released its interest in the Sunglow Property. In addition, Husband had put up personal property as collateral on business loans.

supplemental decree of divorce and judgment. Wife appeals from the supplemental order as well as from the trial court's denial of the Motion to Reconsider and its decision to overrule the Objections.

## ISSUES

¶8    Wife first argues that the trial court erred in determining the amount of Husband's alimony obligation. In particular, she contends that the court erroneously calculated Husband's income and that the court's alimony findings generally do not support the award.

¶9    Second, Wife challenges several aspects of the trial court's property division. She asserts that the evidence does not support several of the trial court's findings and that some of the findings were inadequate. She also contends that the trial court abused its discretion in establishing the terms for Husband's payment of Wife's property settlement.

¶10    Third, Wife argues that the trial court erred in concluding that the Sunglow Property was not fraudulently conveyed by Husband to his father under the Uniform Fraudulent Transfer Act. *See* Utah Code Ann. §§ 25-6-1 to -16 (LexisNexis 2013).

¶11    Fourth, Wife argues that the trial court abused its discretion by failing to order Husband to pay her the support that remained unpaid under the temporary support order.

¶12    Fifth, Wife argues that the trial court abused its discretion by denying the Motion to Reconsider. She also asserts that the trial court abused its discretion by summarily rejecting the Objections without considering their merits.

¶13    Finally, Wife challenges the trial court's refusal to award her attorney fees.

ANALYSIS

I. Alimony

¶14   Wife argues that the trial court erred in determining the amount of Husband's alimony obligation. We will uphold a trial court's alimony determination on appeal "unless a clear and prejudicial abuse of discretion is demonstrated." *Breinholt v. Breinholt*, 905 P.2d 877, 879 (Utah Ct. App. 1995) (citation and internal quotation marks omitted). An alimony award must be based on the court's consideration of "a number of factors when determining the amount and duration of alimony." *Roberts v. Roberts*, 2014 UT App 211, ¶ 12, 335 P.3d 378. The principal factors are "(i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income; [and] (iii) the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(8)(a) (LexisNexis 2013); *see also Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985). The trial court must also "make adequate findings on all material issues of alimony to reveal the reasoning followed in making the award." *Bolliger v. Bolliger*, 2000 UT App 47, ¶ 19, 997 P.2d 903 (citation and internal quotation marks omitted). "Findings are adequate only if they are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Rayner v. Rayner*, 2013 UT App 269, ¶ 11, 316 P.3d 455 (citation and internal quotation marks omitted).

¶15   In addition, a trial court must take into account the goals of a proper alimony award, which are "(1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge." *Dobson v. Dobson*, 2012 UT App 373, ¶ 20, 294 P.3d 591 (citation and internal quotation marks omitted). In cases where the parties' combined resources are insufficient to support both parties at the economic level they

enjoyed during marriage, equalization of "the parties' respective standards of living" is appropriate. Utah Code Ann. § 30-3-5(8)(f). "Equalization of income . . . is a trial court's remedy for those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs." *Keyes v. Keyes*, 2015 UT App 114, ¶ 39, 351 P.3d 90 (citation and internal quotation marks omitted). Accordingly, the trial court "must determine how to equitably allocate the burden of insufficient income" to meet the needs of "two individuals living separately." *Id.*

A.     Husband's Income Calculation

¶16     Wife first contends that the trial court erroneously calculated Husband's income. For each statutory factor the court considers to determine alimony, "the trial court must make sufficiently detailed findings of fact." *Connell v. Connell*, 2010 UT App 139, ¶ 12, 233 P.3d 836 (citation and internal quotation marks omitted). We will reverse a trial court's findings of fact "only if the findings are clearly erroneous." *Breinholt*, 905 P.2d at 879. "A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if [the] court has a definite and firm conviction that a mistake has been made." *Lamar v. Lamar*, 2012 UT App 326, ¶ 2, 292 P.3d 86 (citation and internal quotation marks omitted).

¶17     The trial court found that "testimony at trial established that [Husband] treats both businesses as sole proprietorships, routinely paying all business and personal expenses out of business checking accounts." It therefore determined Husband's income according to the procedure outlined in Utah Code section 78B-12-203 for self-employed persons, like Husband. "Gross income from self-employment or operation of a business shall be calculated by subtracting necessary expenses required for self-employment or business operation from gross receipts." Utah Code Ann. § 78B-12-203(4)(a) (LexisNexis 2012). The trial

court clearly outlined the procedure it used to determine Husband's income in accordance with the statute's directions. The court used the information provided on Husband's corporate tax returns from 2005 to 2008 and from 2011 to 2012 to determine Husband's average monthly income. The court explained that it did not consider the 2009 and 2010 tax years because of the substantial losses Husband incurred due to "a faulty credit card reader at the gas pumps," reasoning that it would be "improper and unfair to include the huge business losses from those two years in averaging gross receipts and operating expenses." For each of the tax years it did take into account, the court deducted the average operating expenses from the average gross receipts for the Travel Plaza and Milton's South separately, determined the average annual profit from each business, and then divided the result by twelve to arrive at an average monthly income from each business. It then added those amounts together to arrive at a total average monthly income for Husband of $10,188, which the court rounded to $10,000. The court then used this figure "for calculation of child support and for determination concerning spousal support."

¶18 Wife objected, claiming that the court failed to include certain rental receipts from the Travel Plaza in its calculations of Husband's income. The court acknowledged that the Travel Plaza "also includes a strip mall business from which [Husband] derives rental income" but found that, although Wife "argues this rental income should be considered separately from the remainder of . . . [the] Travel Plaza income," the "rental income from the strip mall has consistently been reported on tax returns as part of the overall income from [the] Travel Plaza," which the court took into account in calculating Husband's income. As a consequence, the court concluded that it would amount to double counting to treat the rental receipts as a separate component of Husband's income for support purposes. Wife argues that by failing to count these rental receipts as additional income, the trial court improperly ignored an additional $4,400

of monthly income, which would have increased Husband's ability to pay alimony. Specifically, Wife argues that the trial court erred by misinterpreting Husband's corporate tax returns to include the strip mall rents. She claims that the line 11—"rents"—item on the corporate tax return is a deduction, not an accounting of rental income from investment properties, and that the trial court should have consulted Part I of Schedule E on Husband's personal tax returns to calculate his rental income. She asserts that, had the court properly considered the tax returns in evidence, it must have determined Husband's monthly income to be at least $14,400, rather than the $10,000 figure it used to calculate her alimony award. Thus, Wife essentially argues that the trial court interpreted the evidence incorrectly.

¶19     But to successfully challenge a trial court's factual finding on appeal, the appellant must "overcom[e] the healthy dose of deference owed to factual findings" by "identify[ing] and deal[ing] with [the] supportive evidence" and demonstrating the legal problem in that evidence, generally through marshaling the evidence. *State v. Nielsen*, 2014 UT 10, ¶¶ 40–41, 326 P.3d 645; *Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 ("The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a 'fatal flaw'—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings."). The Utah Rules of Appellate Procedure require that "[a] party challenging a fact finding must first marshal all record evidence that supports the challenged finding." Utah R. App. P. 24(a)(9). We require this, because to properly marshal the evidence, the appellant

> must temporarily remove its own prejudices and fully embrace the adversary's position. . . . In so doing, appellants must present the evidence in a light most favorable to the trial court, and not

> attempt to construe the evidence in a light favorable to their case. Appellants cannot merely present carefully selected facts and excerpts from the record in support of their position. Nor can they simply restate or review evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact.

*Ostermiller v. Ostermiller*, 2010 UT 43, ¶ 20, 233 P.3d 489 (citation and internal quotation marks omitted); *see also Simmons Media Group, LLC v. Waykar, LLC*, 2014 UT App 145, ¶ 42, 335 P.3d 885 ("An appellant cannot demonstrate that the evidence supporting a factual finding falls short without giving a candid account of that evidence." (citation and internal quotation marks omitted)); *Kimball*, 2009 UT App 233, ¶ 20 n.5 (noting that "marshaling" is important because it "adds discipline and order to challenges to factual findings, precluding an unfocused allegation that the findings lack evidentiary support and requiring the appellate court to comb the record and see if that might possibly be true," and instead places the burden on the appellant to "identify which particular findings are challenged as lacking adequate evidentiary support and then show the court why that is so"). And our supreme court has stated that "a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies" to factual findings. *Nielsen*, 2014 UT 10, ¶ 40; *see also Simmons Media Group*, 2014 UT App 145, ¶ 42 ("[A]n argument that does not fully acknowledge the evidence supporting a finding of fact has little chance, as a matter of logic, of demonstrating that the findings lacked adequate factual support." (citation and internal quotation marks omitted)). Wife has failed to marshal the evidence.

¶20   In particular, Wife has not demonstrated that, although Husband's corporate tax returns included a line-item for "rents," the court's finding that it had already included all pertinent rents

in Husband's income was so undermined by other evidence that the finding was nonetheless left without any support. *See Kimball*, 2009 UT App 233, ¶ 20 n.5 ("If there is some supportive evidence, . . . it is the challenger's burden to . . . explain why the evidence is legally insufficient to support the finding." (citation and internal quotation marks omitted)). The problem with Wife's argument of error is that both types of Husband's tax returns—corporate and personal—included entries for rents and rental income. As a result, to prevail on this argument, she must show that the court's alleged error was more than simply a factual choice between the conflicting evidence contained in those returns. Instead, she must show that the trial court's factual conclusion about the rents amounts to clear error.

¶21    During trial, extensive evidence was presented regarding the complicated intermingling of Husband's personal and business financial affairs and accounts. More than 190 exhibits were admitted, which included loan documents, property appraisals, personal and corporate tax returns, general ledgers for each business, and bank statements. Due to the complexity of the issues and the volume of exhibits, the court requested that the parties submit closing briefs in lieu of closing arguments. But even so, the court still described it as "difficult to precisely ascertain" certain core information, such as monthly income or the valuation of certain assets. As a consequence, the court conceded that while it "understands its valuation is not perfect . . . [the valuation] is the best [it] can muster under the circumstances." Our review of the record corroborates this assessment; indeed, the very complexity of the factual arguments Wife makes on appeal more than support the court's determination in that regard. Neither Husband nor Wife directed the judge to an exhibit that could clearly establish Husband's monthly income, much less where the income from strip mall rents could be reliably accounted for.

¶22   Further, neither party provided expert testimony to assist the trial court in understanding the extensive financial documents the parties provided at trial or to overcome the accounting challenge they posed to the court's final assessment and adjudication of the issues. *See State v. Rasabout*, 2015 UT 72, ¶ 18, 356 P.3d 1258 (noting that in cases where the "knowledge and expertise required" is "usually not within the common knowledge of judges," "testimony from relevant experts is generally required in order to ensure that [judges] have adequate knowledge upon which to base their decisions" (alteration in original) (citation and internal quotation marks omitted)); *Brown v. Small*, 825 P.2d 1209, 1212 (Mont. 1992) (noting that the complexity inherent in some cases makes arriving at a conclusion that is wholly "consistent with the evidence" difficult if an expert is not provided (citation and internal quotation marks omitted)). Instead, only one witness—Husband's long-time accountant—testified regarding the strip mall rental income. He testified that the accounting for the strip mall was separate from the accounting of the Travel Plaza and that, as a result, the strip mall rental income would have appeared on Husband's personal returns. However, the witness did not testify regarding where on Husband's personal tax returns the rental income would have been accounted for nor did he testify about what aspects of Husband's income might be accounted for in the "rents" line-item on Husband's corporate tax returns.

¶23   And subsequent to trial, Wife argued in the Motion to Reconsider and the Objections only that the strip mall rents were not included in the corporate tax returns, directed the trial court to the pages and lines of Husband's personal income tax returns where she contended the strip mall rents appeared, and provided a table detailing the strip mall rents for 2005 to 2008 and 2011 to 2012 with no explanation of how those rents were accounted for in the documents she referenced. Wife did not argue to the trial court, as she does now on appeal, that the

"rents" line-item did not account for the strip mall rents, nor did she explain why it was error for the trial court to find that that line-item included those rents. Instead, she merely argued that the trial court's assessment of the evidence—the information provided on Husband's corporate tax returns—was incorrect.

¶24 Furthermore, on appeal, Wife's explanation of the financial evidence she claims supports her position can only be described as impenetrable.[4] Rather than a reasoned explanation, she presents what amounts to an accounting puzzle that she seems to expect this court to put together from a pile of cursory explanations—explanations that do not appear to have been presented to the trial court, much less with the help of an expert

---

4. As an example, Wife provides in her briefing on appeal a detailed explanation regarding tax year 2011:

> Again referring to 2011, the Taft Travel Plaza "Ordinary business income" (line 21) was $4,060. The Milton's South "Ordinary business income" was $46,282, and Husband's 33.4% share of that was $15,458 (Schedule K-1, attached to the corporate return). These amounts appear on page 2 of Schedule E of Husband's personal tax return. Part I of Schedule E for 2011, which reports "Income or Loss From [R]ental Real Estate and Royalties," shows rental income of $59,177 on line 3b, which is in addition to the income from the corporations. Part II of Schedule E, which reports Income or Loss From Partnerships and S Corporations," gives the $4,060 (Taft Travel Plaza) and $15,458 (Milton's South) figures described above. The total $68,937 in supplemental income (line 41 of Schedule E) appears on line 17 of Form 1040, again confirming that rents were in addition to the corporate income.

who could trace a discernible path through the numbers. Such an approach transfers too much of the burden of evidentiary interpretation to the appellate court; more importantly, because these arguments were not made to the trial court in the first place, Wife has not carried the considerable burden of persuading us that the trial court's factual finding on this point was made in error. *See Barrani v. Barrani*, 2014 UT App 204, ¶ 24, 334 P.3d 994 ("[A]n appellate court's role is not to reweigh the evidence presented at trial but only to determine whether the court's decision is supported by the evidence, leaving questions of credibility and weight to the trial court.").

¶25    In particular, where "rents" was a line-item that factored into the overall yearly accounting on each of the corporate tax returns the trial court relied on to assess Husband's income, Wife has not demonstrated that it was error for the court to choose to rely on the information in those returns rather than in Husband's personal returns. Instead, Wife's arguments subsequent to trial merely assert one interpretation of the available evidence without providing a reasoned accounting basis to conclude that "rents" in the corporate tax returns did not account for strip mall rental income. Certainly, we cannot conclude that it was clear error for the court to find that Husband's corporate tax returns accounted for the strip mall rents; the evidence presented to the trial court on this issue was, at best, conflicting. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 ("No matter what contrary facts might have been found from all the evidence, our deference to the trial court's pre-eminent role as fact-finder requires us to take the findings of fact as our starting point, unless particular findings have been shown . . . to lack legally adequate evidentiary support."). And under circumstances like these, where a court is largely left to its own resources to untangle complex financial issues, we are reluctant to conclude that an interpretive error was made, especially based on factual arguments that have been presented on appeal in a far more focused and complex form

than to the trial court. Rather, under such circumstances, the presumption of validity we afford to a trial court when it adjusts the financial interests of parties to a divorce is at its most robust. *See Savage v. Savage*, 658 P.2d 1201, 1203 (Utah 1983) ("In a divorce proceeding, it is well established that the trial court is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity.").

¶26 Consequently, given the evidence before the trial court regarding the accounting of the strip mall rents, we conclude that it was not error for the trial court to determine that the rental income was accounted for in the "rents" line-item of Husband's corporate tax returns.

B.     Wife's Needs and Husband's Ability to Pay

¶27 Wife next contends that the trial court failed to consider her necessary expenses and make adequate findings regarding Husband's ability to pay. The trial court found that there were "simply not enough financial resources available to adequately provide for both parties the standard of living they desire," and it therefore fashioned the award "with an eye toward somewhat equalizing the standard of living for both parties." It ultimately awarded Wife alimony "in the amount of $1,000 per month for 22 years and 6 months, the length of the marriage," and based this award on several findings regarding the parties' relative incomes and expenses. First, it found that Wife had a "fair" financial condition at the time of trial but that she had "depended on [Husband] and family members for support" and was "living below the standard of living she enjoyed during the marriage." The court concluded that, as a result, Wife had "a need for financial support." Next, it found that Wife was able to work and that her income was $1,900, an amount roughly equal to the monthly stipend she received as a doctoral candidate at the University of Utah. It also found that although Wife claimed monthly expenses of $7,645, that amount was "unreasonably

inflated in some areas" and that Wife was "able to meet $2,962 of the monthly expenses she claim[ed were] necessary." Finally, the court found that Husband's monthly income was $10,000, but it did not make a specific finding as to Husband's expenses. Instead, it found that Husband's "personal finances are thoroughly entangled with business finances" and that "the amount [Husband] claims for purposes of personal income taxes and expenses may not accurately reflect the financial assets at [Husband's] disposal." The court also noted that Husband's businesses were "heavily in debt." Nonetheless, it found that "[Husband] still has roughly the same standard of living the parties had during the marriage, while [Wife] struggles to get by."

¶28   We agree with Wife that the trial court's findings do not adequately support the alimony award. The trial court purported to equalize the parties' respective incomes by setting the alimony award at $1,000, but it failed to make specific findings as to either Husband's or Wife's expenses. Instead, it noted the difficulty in determining Husband's expenses but did not ultimately designate or appropriately estimate an amount for those expenses. Similarly, while it found that Wife's claimed monthly expenses of $7,645 were "unreasonably inflated," it did not determine the expenses that it considered reasonable. The lack of detailed findings in this respect makes it impossible for us to determine on review whether the $1,000 alimony award was proper. Husband's and Wife's relative expenses are determinations that relate directly to Wife's ability "to produce sufficient income" and Husband's ability "to provide support"—in other words, findings the trial court must make to determine the alimony award. *See* Utah Code Ann. § 30-3-5(8)(a) (LexisNexis 2013); *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985). Their respective expenses are also significant to the determination of whether the "burden of insufficient income" has been "equitably allocate[d]" between Husband and Wife. *See Keyes v. Keyes*, 2015 UT App 114, ¶¶ 39–40, 351 P.3d 90 (noting

that the award was an inequitable allocation of the shortfall burden because the husband was left "without the ability to meet any of his most basic needs"); *see also Hansen v. Hansen*, 2014 UT App 96, ¶ 8 & n.4, 325 P.3d 864 (holding that equalization of income was not in error where both the husband and the wife had a shortfall of $521 to meet their monthly expenses); *Kidd v. Kidd*, 2014 UT App 26, ¶ 3, 321 P.3d 200 (affirming an alimony award where the court added together the parties' monthly income, divided that income in half, and then subtracted the wife's imputed income to leave both parties with a monthly shortfall). Thus, without more specific findings regarding the parties' respective monthly expenses, we are unable to determine if the trial court properly considered the requisite factors, whether the alimony award accomplished the court's stated goal of equalizing the parties' incomes, or whether instead the court's decision simply formalized the inequitable circumstances that seemed to trouble the trial court—namely, that Husband continued to maintain a lifestyle "roughly" similar to what he had enjoyed during the marriage while Wife "struggle[d] to get by." Accordingly, we remand the case to the trial court to make these specific findings and re-evaluate the alimony award in light of them.[5]

---

5. Because we are remanding for the trial court to make adequate findings, once those findings have been made, the trial court is free to reassess "the awards in light of those findings and our opinion." *Willey v. Willey*, 866 P.2d 547, 556 (Utah Ct. App. 1993). In particular, "[t]o the extent that [Husband's and Wife's] monthly expenses are modified on remand, the trial court should also reconsider its alimony determination in light of the altered figure." *Dobson v. Dobson*, 2012 UT App 373, ¶ 29, 294 P.3d 591; *see also Keyes v. Keyes*, 2015 UT App 114, ¶ 42, 351 P.3d 90 (stating that because the case was remanded for the trial court to "further consider the award of alimony . . . the court may

(continued…)

¶29 In so doing, we note that the record shows the trial court "engaged in a thoughtful review" of the circumstances in this difficult case. *See Stonehocker v, Stonehocker*, 2008 UT App 11, ¶ 24, 176 P.3d 476. Indeed, the heart of the court's difficulties appears to be the "entanglement" of Husband's business and personal expenses. It is also apparent that a substantial portion of the responsibility for any lack of clarity in the trial court's findings must fall on the parties' failure to substantiate, rather than merely summarize, their monthly expenses and income. *See Dahl v. Dahl*, 2015 UT 79, ¶¶ 95–96 (explaining that "[a] party seeking alimony bears the burden of demonstrating to the court that the *Jones* factors support an award of alimony" and that burden is satisfied when the party seeking alimony "provide[s] the court with a credible financial declaration and financial documentation to demonstrate that the *Jones* factors support an award of alimony" (citations omitted)). As a consequence, the ability of the trial court to precisely determine the parties' expenses may be limited by gaps in the evidence they presented at trial. In such situations, the court must make the best of what the parties have given it to work with, and if precision is not possible, findings that are "sufficiently detailed" may include estimates shown to be reasonably derived from the available evidence such as it is. *See Stonehocker*, 2008 UT App 11, ¶ 16 ("The findings [of fact] should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." (citation and internal quotation marks omitted)). But at this point, absent further explanation of Wife's and Husband's expenses to support a determination regarding Wife's needs and Husband's ability to pay and a fuller explication of how the

---

(…continued)

need to reconsider other aspects of its alimony decision . . . and should not consider this remand order to either require or restrict it from doing so").

ultimate award properly fulfills the purpose of alimony in this case—either to ensure Wife's ability to continue to live the lifestyle established during the marriage[6] or to equalize the burden of a shortfall—"we cannot assess the merits of the challenges to" the alimony award.[7] *See id.* ¶ 24.

---

6. Wife also argues that the trial court erred by "bas[ing] alimony on Wife's actual expenses during the divorce action" and that, instead, the trial court should have "determine[d] Wife's reasonable and necessary expenses to maintain the standard of living enjoyed during the marriage." Wife points to the trial court's statement that she was "*presently* able to meet $2,962 of the monthly expenses she claims are necessary . . . [and] is in need of some financial assistance." (Emphasis added.) While a trial court should generally consider a party's "financial condition and needs" "in light of the standard of living [the parties] had during marriage," *Batty v. Batty*, 2006 UT App 506, ¶¶ 4–5, 153 P.3d 827 (alteration in original) (citations and internal quotation marks omitted), when there is a shortfall in the resources required to allow each party to maintain the standard of living enjoyed during marriage, it is not improper to consider the present financial resources and needs "to ensure that . . . the shortfall is equitably shared," *Kidd v. Kidd*, 2014 UT App 26, ¶ 26, 321 P.3d 200. Nevertheless, it seems problematic to base Wife's expenses on her apparently strained circumstances at the time of trial, while suggesting that Husband's expenses were appropriately based on the standard of living during the marriage. Rather, where the court is faced with a shortfall, the determination of expenses ought to meet the requirements of equity under the circumstances.

7. The trial court also concluded that "[t]his award of alimony, added to [Wife's] stipend, child support, and property settlement, would enable [Wife] to meet her expenses and somewhat equalize the standard of living for both parties." Wife

(continued…)

¶30   In sum, we remand to the trial court to make more detailed findings regarding Wife's financial needs and Husband's ability to pay. However, we affirm the trial court's determination of Husband's income.

## II. Property Valuation and Division

¶31   Wife raises several contentions regarding the property valuation and division. First, Wife argues that the court's valuation of certain marital assets and debts is either not supported by the evidence or lacks adequate findings. She argues that the trial court improperly conflated the business assets and expenses of the Travel Plaza with Milton's South, that the court's finding regarding the parties' real property debt was not supported by the evidence, that the court erroneously awarded Husband certain water shares, that the court's valuation for a Mercury Sable is not supported by the evidence, and that the court failed to account for or award Wife her share of the business inventory. "A challenge to the sufficiency of the evidence concerns the trial court's findings of fact. Those findings will not be disturbed unless they are clearly erroneous." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (citation and internal quotation marks omitted). As noted above, *see supra*

---

(…continued)

argues that the trial court improperly considered her property settlement when determining the alimony award. While consideration of the property award when making an alimony determination is not generally improper, in this case, reliance on the property award seems problematic because the judgment is payable over a ten-year period, with the monthly amount at Husband's sole discretion, thus making it an unreliable income supplement. *See infra* Part II.B. In any event, the trial court will have an opportunity to reconsider both its alimony determination and property settlement on remand.

¶¶ 19–20, a party who challenges the sufficiency of the evidence must "establish[] a basis for overcoming the healthy dose of deference owed to factual findings" by marshaling the evidence that "*supports* the very findings the appellant resists" and then demonstrating the "legal insufficiency" in that evidence. *State v. Nielsen*, 2014 UT 10, ¶ 41, 326 P.3d 645; *Kimball*, 2009 UT App 233, ¶ 21 (citation and internal quotation marks omitted).

¶32    Second, Wife argues that the trial court abused its discretion when it determined that Husband could pay the property award in monthly installments of his choosing for ten years, when a final balloon payment becomes due, with the interest rate set at the judgment rate of only 2.13%. "The trial court in a divorce action is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Ouk v. Ouk*, 2015 UT App 104, ¶ 3, 348 P.3d 751 (citation and internal quotation marks omitted). "Thus, this court will not disturb a court's distribution of marital property unless it is clearly unjust or a clear abuse of discretion." *Id.* ¶ 10 (citation and internal quotation marks omitted).

¶33    The trial court found that "all real property should be considered marital property, subject to equitable distribution." In order to ensure an equitable property division, a court should engage in a four-step process:

> First, the trial court should distinguish between separate and marital property; second, it should consider whether there are exceptional circumstances that overcome the general presumption that marital property [should] be divided equally between the parties; third, it should assign values to each item of marital property; and fourth, it should distribute the property in a manner consistent with its findings

and with a view toward allowing each party to go forward with his or her separate life.

*Boyer v. Boyer*, 2011 UT App 141, ¶ 10, 259 P.3d 1063 (alteration in original) (citation, footnote, and internal quotation marks omitted). Importantly, "[d]etermining and assigning values to marital property is a matter for the trial court, and this Court will not disturb those determinations absent a showing of clear abuse of discretion." *Ebbert v. Ebbert*, 744 P.2d 1019, 1023 (Utah Ct. App. 1987) (citation and internal quotation marks omitted). Failing to accept one party's "proposed valuations" "does not constitute an abuse of discretion." *Id.* However, "[i]n order to permit appellate review of a trial court's property distribution in a divorce proceeding, the distribution should be based upon written findings," and "[f]ailure to make findings on all material issues is reversible error unless the facts in the record are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Andersen v. Andersen*, 757 P.2d 476, 479 (Utah Ct. App. 1988). Thus, we consider whether the trial court "assigned values" to the marital properties and assets and then distributed them "in a manner consistent" with those findings.

A.    Valuation of the Property

1.    Separate Business Asset and Expense Evaluation

¶34    Wife first argues that "the trial court should have evaluated the assets and expenses for [the] Travel Plaza separately from Milton's South." She claims that at the time of the divorce in 2009, Husband owned only 33.4% of Milton's South, that it was error for the trial court to treat the businesses as unitary, and that this conflation resulted in a note owed by Milton's South to the Travel Plaza being "ignored as an asset of [the] Travel Plaza" and the Travel Plaza's expenses being "inflated because they included Milton's South expenditures." She concedes that, because the accounts were commingled, "it was impossible to determine exactly which expenses should be

charged to Milton's South." Nonetheless she urges us to remand because "the trial court should have assessed Milton's South for its share of expenses paid by [the] Travel Plaza." Husband urges that Wife did not preserve this issue for appeal and that it is therefore waived. We agree with Husband.

¶35 "[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (alterations in original) (citation and internal quotation marks omitted). In other words, the issue "must at least be raised to a level of consciousness such that the trial judge can consider it." *See LeBaron & Assoc. Inc. v. Rebel Enters., Inc.*, 823 P.2d 479, 483 (Utah Ct. App. 1991) (citation and internal quotation marks omitted). If it is not, and if the party does not argue an exception on appeal, the argument may be deemed waived. *See 438 Main St.*, 2004 UT 72, ¶ 51; *see also Jacob v. Bezzant*, 2009 UT 37, ¶ 34, 212 P.3d 535 ("[W]e do not address arguments brought for the first time on appeal unless the [trial] court committed plain error or exceptional circumstances exist." (second alteration in original) (citation and internal quotation marks omitted)).

¶36 Wife's assertion that the trial court did not take into account Husband's 33.4% interest in Milton's South as of the divorce in December 2009 appears to be correct; the court calculated the value as though Husband's ownership interest in both historically had been 100%, as it was by the time of trial. However, Wife did not present the argument she now raises—that the trial court's conflation of the Travel Plaza and Milton's South's values and debts created subsidiary errors in the business asset valuation and inflation of the Travel Plaza's expenses—to the trial court "in such a way" that the court had "an opportunity to rule on [this] issue." *See 438 Main St.*, 2004 UT 72, ¶ 51 (citation and internal quotation marks omitted).

¶37   Prior to this appeal, Wife did not alert the trial court that treating both businesses "as one unitary business" was an error. In the briefing she submitted in lieu of closing arguments, she argued that the trial court should value the marital estate as of 2007 (rather than as of the time of their divorce in 2009) because, she alleged, in 2007 Husband began to intentionally dissipate the marital estate; Wife pointed to Milton's South's "free use [of the Travel Plaza's] money" to pay its expenses only as proof of Husband's intentional dissipation. She also made no mention of the note Milton's South owed to the Travel Plaza in her closing arguments. In the trial court's memorandum decision, the court rejected Wife's dissipation argument, found that Husband had not dissipated the marital estate, and concluded that "no adjustments need[ed] to be made to fairly and equitably divide marital assets." It also expressly treated the Travel Plaza and Milton's South as though they were a single entity, explaining that it "considers these businesses together because they both appear to be encumbered by the same debt."

¶38   Thus, at the time of the memorandum decision, Wife was fully alerted to the trial court's view of the business valuation and the effect of any potential ownership differential between the two businesses. In particular, it was clear that the trial court treated the businesses as a single entity for purposes of valuation and division of the marital property. But in the Objections, Wife did not object to the trial court's treatment of the two businesses as a single entity. Instead, Wife contested only the trial court's calculation of the total debt encumbering *all* of the marital real property, including the businesses. By her calculation, the total debt encumbering all the real property owned by the parties was overstated by $154,687. She did not, however, argue that the source of this valuation error was the trial court's treatment of the two businesses as unitary. And she only conclusorily stated in the Objections to the business personal property valuation that the note owed from Milton's South to the Travel Plaza was not included in that valuation. Wife did not argue to the trial

court that either or both of the subsidiary errors she alleges on appeal (failing to account for the Milton's South expenses paid by the Travel Plaza and ignoring the note) flowed from the same overarching error—the court's treatment of the two businesses as unitary. Instead, Wife failed to raise her claim of an error regarding expenses at any point in the Objections and only argued the claim of an error regarding the note as one that apparently diminished the valuation of the business personal property. Thus, while Wife provided the trial court with an opportunity to reassess the evidence supporting its calculation of the *total* marital debt and whether the note should have been included as an asset to offset the total marital debt, the trial court was not provided an opportunity to reassess its decision to consider both of the businesses as one business. *See Dickman Family Props., Inc. v. White*, 2013 UT App 116, ¶ 12, 302 P.3d 833 (concluding that an issue had not been preserved where the appellant was "unambiguously alerted" to the court's "conception" regarding the issue and where the appellant let two opportunities to bring the issue to the court's attention pass by).

¶39    Nonetheless, in her reply brief, Wife contends that she preserved this issue because she mentioned in the Objections that the note that Milton's South owed to the Travel Plaza was not included in the business asset valuation and because "[h]er closing arguments also noted that Milton's South expenses were improperly treated as necessary expenses for [the Travel Plaza]." But "a party may not claim to have preserved an issue for appeal by merely mentioning" it. *Pratt v. Nelson*, 2007 UT 41, ¶ 15, 164 P.3d 366 (citation and internal quotation marks omitted). Moreover, neither reference connected the valuation issues together or sufficiently focused the trial court's attention on the allegedly fundamental error of treating both businesses "as one unitary business" wholly owned by Husband—the error she now claims is the overarching source of the expenses and valuation errors. *See id.* (noting that one of the requirements for

the trial court to have an opportunity to adequately rule on an issue is that "the issue must be *specifically* raised" (emphasis added) (citation and internal quotation marks omitted)).

¶40   Thus, it does not appear that the trial court was provided an opportunity to address and correct the issues Wife now argues on appeal.[8] *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801. And because Wife has not argued for or demonstrated exceptional circumstances or plain error on appeal, we do not consider her arguments regarding the note receivable and the inflated expenses of Milton's South.

2.     Marital Property Debt Valuation

¶41   Wife argues that the "evidence does not support the court's findings" that the value of the marital debt—both the businesses and the personal real property—at the time of the divorce was $1,373,500, because "the trial court's figures

---

8. Wife also argues that she was not required to object to the trial court's valuation because its error first arose in a ruling following trial. But regardless of whether the preservation requirement generally applies when the error arises for the first time in a trial court's final order, Wife herself provided the trial court an opportunity to reassess its findings and conclusions when she objected to and moved to have the memorandum decision reconsidered and, having embarked on that approach, could have brought this issue to the court's attention at that point. This is particularly true when the issue was not raised to the court's attention before the decision and the error was, in that sense, a latent one from the trial court's perspective. *Cf. Dickman Family Props., Inc. v. White*, 2013 UT App 116, ¶ 12, 302 P.3d 833 (noting that an issue was not preserved where, in part, the appealing party failed to include the error argument they made on appeal in their objections to the court's proposed order below).

overstate the debt and understate the total equity by at least $154,687."

¶42 Under the circumstances, it appears to us that the trial court appropriately considered the evidence and made reasoned determinations to arrive at its decision regarding the total amount of debt encumbering the marital properties. The trial court found that the Travel Plaza and Milton's South had a combined value of $1.465 million and were jointly encumbered by debt totaling $1.2 million. The court stated that it valued the two properties together because "they both appear to be encumbered by the same debt" and it arrived at the debt figure because "[t]he parties seem to agree in Exhibit 70 [December 2009 ASSETS of Milton Lee Taft III & Teresa Taft] and [Husband's] Final Closing Statement, . . . that this is the appropriate amount of debt" for these two properties combined. In addition to the businesses, the parties acquired three other parcels of real property during the marriage—the Home Parcel, the Bicknell Lot, and the Richfield Parcel—which the court was required to divide by taking into account the value and associated debt of each. In this regard, the court found that the Home Parcel had a value of $170,000 but that it was encumbered by debt of $92,500; the Bicknell Lot had a value of $18,000 and no debt; and the Richfield Parcel had a value of $60,000, but a debt of $81,000. The court explained in detail how it determined the debt associated with each parcel of property. For example, the court stated that it simply averaged the two estimates provided by the parties to find the "fair amount of debt" for both the Home Parcel and the Richfield Parcel because the parties did not explain how they arrived at their estimates of the debt on those parcels. In addition, we note that neither party provided the court with exhibits regarding the debt on any of the personal real properties that did more than summarize what that party supposed the debt to be in 2009 and that the trial court specifically found that "there is really no authoritative source from which to base an accurate summary of debt related

specifically to each asset." Thus, it is apparent that the trial court identified the evidence on which it relied to make each of the debt determinations and, when the evidence was in conflict, noted where and why it averaged the values urged by the parties to arrive at its determined valuation.

¶43    Nevertheless, Wife points to several exhibits that purport to show that at the time of the divorce the parties' total real estate debt was $1,218,812.70 and that, consequently, the trial court's debt determination "understate[d] the total equity by at least $154,687." But Wife's arguments on this point fail because, rather than marshaling the supportive evidence and directing us to the fatal flaw in that evidence or engaging with the trial court's reasoning, Wife simply points us toward certain exhibits—her exhibits that the trial court did not rely on when it made its determinations—that she contends provide accurate loan information that, in the aggregate, suggests the trial court "overstate[d] the debt and understate[d] the total equity" of the parties' properties. *See State v. Nielsen*, 2014 UT 10, ¶ 40, 326 P.3d 645 (noting that "an appellant who seeks to prevail in challenging the sufficiency of the evidence to support a factual finding . . . on appeal should follow the dictates of rule 24(a)(9) [of the Utah Rules of Appellate Procedure], as a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to such issues"). As discussed above, *see supra* ¶¶ 19–20, Wife cannot carry her burden by simply listing or rehashing the evidence and arguments she presented during trial. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 21, 217 P.3d 733 (noting that parties cannot prevail by "just list[ing] all the evidence presented at trial or simply rehash[ing] the arguments on evidence they presented at trial"). Nor can Wife persuasively carry her burden by merely pointing to evidence that might have supported findings more favorable to her; rather, Wife must identify flaws in the evidence relied on by

the trial court that rendered the trial court's reliance on it, and the findings resulting from it, clearly erroneous. *Id*.

¶44 Furthermore, we note that it is within the trial court's discretion to weigh the evidence and accept what it finds to be most credible and reject or give less weight to the rest. *See Schaumberg v. Schaumberg*, 875 P.2d 598, 603 (Utah Ct. App. 1994) (stating that it is appropriate to afford the trial court considerable deference in determining the facts because "the trial court . . . [is] in a superior position to judge the credibility of witnesses and to weigh the evidence"). And "[d]etermination of the value of the assets is a matter for the trial court which will not be reviewed in the absence of a clear abuse of discretion." *Turner v. Turner*, 649 P.2d 6, 8 (Utah 1982) (stating that an appellate court will not weigh the evidence and substitute its judgment for that of a trial court merely because "its judgment may differ"). Consequently, because Wife has failed to point out legal error or deal with the supportive evidence presented at trial, we affirm the trial court's debt valuation.

3.     Water Shares Valuation

¶45 Wife next argues that the trial court should not have awarded the water shares related to the Richfield Parcel "to Husband without assigning any value to [them]" and requests that we remand "with directions to award the water shares to Wife, or alternatively to determine the value of the shares and adjust the property settlement accordingly." "[W]e cannot affirm [a trial court's] determination . . . [if] it fails to enter specific, detailed findings supporting its financial determinations." *Hall v. Hall*, 858 P.2d 1018, 1021 (Utah Ct. App. 1993) (citation omitted). We agree with Wife that the trial court should have made a finding as to the water shares' value and included that value in the property settlement. We remand so that the trial court may do so.

¶46 During trial, Husband testified that he kept "water stock certificates" in a safe deposit box, and when cross-examined by Wife's counsel, Husband stated that he had "four shares of water on the land in Richfield." Wife asserted in the Objections that Husband's disclosure at trial was the first instance she had learned of the existence of the shares, that Husband did not "disclose [these] water shares in his full [financial] disclosure" or his interrogatory responses, and that "[b]ecause Husband failed to disclose these water certificates prior to trial, Wife had no opportunity to investigate and [had] . . . no way to determine their value." She argued that "[i]t is not equitable to award [the] water share[s] to Husband with no valuation." Nonetheless, the trial court awarded Husband "all properties, including water rights or water certificates," without making a determination as to the water shares' value.[9]

---

9. We note that Wife did take steps before trial that should have revealed the existence of the shares had Husband responded appropriately to her discovery requests. She made "use of available discovery procedures" in an effort to avoid a "surprise" at trial regarding potential marital assets by asking in her interrogatories about "any and all documents regarding or relating to any Real Property [w]hich is currently owned or held (either jointly or individually) by [Husband]" or "[w]hich was owned or held (either jointly or individually) by [Husband] . . . between June 1, 1987 and the present." *Cf. Ault v. Dubois*, 739 P.2d 1117, 1122–23 (Utah Ct. App. 1987) (determining that because "surprise at trial . . . could have been easily guarded against by use of available discovery procedures," the trial court's denial of a new trial was not an abuse of discretion). In response, Husband simply directed Wife to his financial disclosure, which did not list the water shares. At trial, Wife's counsel cross-examined Husband about the water shares after Husband had belatedly disclosed their existence. Finally, Wife objected to the court's award of the water shares to Husband in

(continued…)

¶47   One of the steps in equitable property division requires the trial court to "assign values to each item of marital property." *See Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 15, 176 P.3d 476; *see also Munns v. Munns*, 790 P.2d 116, 119 (Utah Ct. App. 1990) (stating that findings regarding property distribution in divorce proceedings "must place a dollar value on the distributed assets"). The trial court did not appear to do this for the water shares. Instead, the court simply awarded the water shares along with the other marital real properties to Husband, apparently without determining the value of those shares either apart from the property, or in terms of any enhancement in the property's value as a consequence of associated water shares. Perhaps the trial court reasoned that the value of the water shares was included in the value of the Richfield Parcel, or perhaps the trial court determined that because the Richfield Parcel was encumbered with greater debt than value, any residual value the water shares might have provided would not exceed the debt. The trial court did not, however, specifically indicate whether its determination of the Richfield Parcel's value included the value of the water shares, and we are therefore unable to effectively review the trial court's decision as to the water shares without more detailed findings. *See Stonehocker*, 2008 UT App 11, ¶ 24. We remand to give the trial court the opportunity to enter more detailed findings as to the water shares, and, if necessary, to amend the property division.

4.    Mercury Sable Valuation

¶48   The parties acquired a Mercury Sable during the marriage, which the trial court awarded to Wife. The trial court found that the vehicle had a value in 2009 of $16,000. This

---

(…continued)
the Objections and therefore alerted the trial court to a potential error in its failure to determine a value for the shares.

valuation was based on Husband's testimony during trial that the purchase price for the vehicle was $16,000 and that Husband was still making payments on the car. Husband's testimony regarding the value of the vehicle focused on Husband's explanation of two particular exhibits: one was a list of assets Husband asserted that Wife took with her in July 2009, which listed the vehicle's value at $16,000, and the other was Husband's "Proposed Property Debt Division" as of 2013, which also listed its value at $16,000. The trial court noted that other than Husband's testimony, "there is no other evidence concerning [the vehicle's] value," that "$16,000 [was] a reasonable value in 2009, and [that Wife] took [the vehicle] without any debt." Wife asserts that the trial court's valuation of the vehicle was not supported by the evidence, because other evidence indicated the vehicle was encumbered with debt that should have offset the value the court assigned to it. In particular, she points first to Husband's financial disclosure, which indicates that both the value and the debt of the vehicle in 2009 was $14,000, and then to a refinance document from 2013 that shows that it continued to be encumbered with debt "more than 3 years after the 2009 divorce." She contends that because Husband's financial disclosure "indicated there was no value in the car" and "this agrees with Wife's reported value, no value should be assigned to the Mercury Sable."

¶49    In order to prevail on this argument, Wife must deal with the evidence that supports the trial court's finding regarding the Mercury Sable's value and "establish[] a basis [in the evidence] for overcoming the healthy dose of deference owed to factual findings." *State v. Nielsen*, 2014 UT 10, ¶¶ 41–42, 326 P.3d 645. But Wife's argument is essentially that the trial court erred in *which* reported value it credited to the vehicle in 2009, not that there was no evidence at all to support the value of $16,000. Wife supports her argument merely by pointing to two other exhibits —Husband's financial disclosure, and a refinance agreement of Wife's that held the vehicle as collateral and showed that, as of

2013, there was approximately $2,800 still owing on it—and contending that the trial court should have relied on those exhibits rather than Husband's testimony and the exhibits supporting it. As we have previously noted, *see supra* ¶¶ 19–20, Wife cannot carry her burden on appeal merely by pointing toward conflicting evidence and asserting that the trial court ought to have relied on her evidence instead. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 21, 217 P.3d 733; *see also Ebbert v. Ebbert*, 744 P.2d 1019, 1023 (Utah Ct. App. 1987) (stating that failing to accept one party's "proposed valuations . . . does not constitute an abuse of discretion"). The exhibit prepared by Husband regarding the property Wife took with her in 2009, although self-reported, did indicate that the value of the vehicle was $16,000 in 2009, and Husband confirmed his belief that that was the 2009 value in his testimony. Certainly Wife has not identified any document among the exhibits, such as the vehicle's original purchase contract, an appraisal, or the original loan documents that clearly stated the vehicle's 2009 value and debt encumbrance. And although Wife relies on Husband's 2009 financial disclosure as proof that the vehicle should be assigned "no value," that exhibit was similar in quality to the exhibits Husband later relied on for the vehicle's value—each reported the value rather than substantiating it with purchase contracts or loan documents. As a consequence, we conclude that Husband's testimony at trial regarding the vehicle's value was sufficient to support the trial court's valuation. *See Olson v. Olson*, 2010 UT App 22, ¶ 27, 226 P.3d 751 ("Generally, a knowledgeable owner may testify as to the market value of property." (citation and internal quotation marks omitted)). Other than pointing to conflicting evidence and her overall disagreement with the valuation itself, Wife has failed to demonstrate how Husband's testimony or the trial court's reliance on that testimony amounted to clear error. *See Stonehocker*, 2008 UT App 11, ¶ 44 (stating that "[w]e defer to the trial court in its findings of fact related to property valuation and distribution" unless they are clearly erroneous).

5.     Business Inventory Valuation

¶50    Wife finally argues that the trial court failed to account for the business inventory in its valuation of the businesses and, as a result, neglected to equitably assign Wife her portion of the value of those assets. She asserts that the trial court's valuation of business property as a whole was only as to "land and fixed business assets" and did not include "the gasoline and store inventories." We agree with Wife.

¶51    The trial court found that "[t]he parties ha[d] already divided the personal property" and determined that "[t]he parties are each awarded their business and personal bank accounts and vehicles currently in their possession . . . subject to payment of all associated debt and insurance." The trial court made specific valuation findings for the many personal property items—such as cars, recreational equipment, and household appliances—that it believed had a "sufficient evidentiary basis" to be fairly divided, and the court refused to divide or make findings regarding those it determined did not. But the trial court did not make a finding or valuation as to the business inventory. Instead, the trial court stated in a footnote that it "consider[ed] bank accounts and assets such as fuel tanks and inventory associated with operation of the businesses to have been awarded along with the business assets."

¶52    We appreciate the difficulties arising from the financial complexity the trial court was faced with, but because "we cannot tell from this record what dollar value, if any, [the trial court] ultimately assigned to the business [inventory]," these findings are inadequate. *See Stonehocker*, 2008 UT App 11, ¶ 44. Nor is it clear to us from the findings why the trial court determined that the value of the business inventory was already taken into account in its distribution of the business real property. The two appraisals that the court relied on to determine the value of the two businesses did not value the business inventory, such as the fuel inside the tanks; they

appeared to include only the value for fixtures, furniture, and equipment necessary to, and included in, the operation of the business ventures.[10] Furthermore, as Wife points out, financial statements prepared by Husband's long-time accountant were presented to the trial court that indicated the value of the inventories and fuel in December of 2009. Tax returns from Milton's South and the Travel Plaza were also admitted into evidence and included line items detailing the amount in inventory at the end of the tax year.

¶53 While the trial court does not have to accept Wife's proposed valuation, the trial court does have to make findings sufficient to allow us to review and determine whether an equitable property award has been made. *See Boyer v. Boyer*, 2011 UT App 141, ¶ 10, 259 P.3d 1063. This is particularly so in light of the fact that the court awarded Husband *all* the real property the parties acquired during marriage and limited Wife's property judgment to a monetary figure derived from an equal division of the marital assets. *See Goggin v. Goggin*, 2013 UT 16, ¶ 7, 299 P.3d 1079 (stating that in equitable distribution, "[g]enerally, [e]ach party is presumed to be entitled to all of his or her separate property and fifty percent of the marital property" (second alteration in original) (citation and internal quotation marks omitted)). Here, the trial court found that the businesses were marital property, and the value of those businesses undoubtedly included the business inventory. But even though the trial court indicated that it considered business inventory to be included in its overall valuation of the Travel Plaza and Milton's South,

---

10. For example, one appraisal found that the Travel Plaza had $65,000 in fixtures, furniture, and equipment, such as the two double-sided fuel pumps, the five above-ground tanks, and the point of sale system. The other appraisal estimated that Milton's South had $192,000 of equipment that included the car wash equipment, the fuel pump, and the tanks.

neither of the appraisals that the trial court relied upon to arrive at the averaged valuation for those properties appear to have included business inventory in the property evaluations or provided a separate estimate of the inventory's value. *See Boyer*, 2011 UT App 141, ¶ 8. The trial court also failed to indicate any other basis for its determination that the inventory was included in the business asset valuation. Certainly, there was a reasonable basis for the court to include business inventory as a component of the award of the businesses to Husband, but we are unable to determine whether the court appropriately took into account the value of that inventory in determining the amount to be awarded to Wife as her share of the marital property and thus whether the award met the requirements of equity.

¶54    We do not suggest that a trial court tasked with equitably dividing marital property must always make separate findings regarding different aspects or components of one asset—in this case, for example, to specifically distinguish the real property value from the inventory value in assessing the overall worth of the businesses. As we have said, "trial courts are not expected to view each item of marital property in isolation and divide each separately" and "the trial court is permitted to look at the mar[it]al property in its entirety and to apportion it in a manner that best facilitates 'a clean break' between the parties and achieves a result that equitably divides the marital property as a whole." *Id.* ¶ 10 (citation omitted). But under these circumstances, and considering the evidence the trial court relied on to make its business asset valuation, we conclude that Wife is correct that the trial court ought to have made more detailed findings regarding its basis for considering business inventory to have been included in the business assets awards. We therefore remand for the trial court to do so.

B.      Husband's Discretion Regarding Payment of Wife's Property Judgment

¶55      Wife next argues that the trial court erred "by giving Husband discretion to determine the amount of any monthly payments [towards payment for] the property settlement to Wife." "Trial courts have considerable discretion in determining . . . property distribution in divorce cases, and [such determinations] will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Stonehocker*, 2008 UT App 11, ¶ 8 (omission in original) (citation and internal quotation marks omitted).

¶56      Wife correctly asserts that she is entitled both to an equitable property award, *see Olsen v. Olsen*, 2007 UT App 296, ¶ 23, 169 P.3d 765, and to "interest on the accrued installments" on the judgment, *see McKay v. McKay*, 370 P.2d 358, 359 (Utah 1962). The trial court awarded Wife a property judgment of $169,500 plus "interest at the judgment rate of 2.13%, as provided by Utah Code [section] 15-1-4." The trial court arrived at this judgment by finding that "all real property should be considered marital property, subject to equitable distribution" and that "the businesses are necessary for [Husband's] livelihood, and the remaining properties have some family significance to [Husband]." On that basis, the trial court awarded all the real property to Husband, "subject to his assumption and payment of all debt thereon." It then calculated the net value of the real property assets at the time of the divorce in 2009 to be $339,500 and allocated to Wife half of that value, or $169,750. In addition, the trial court ruled that the property judgment "shall constitute a lien against all real and personal property awarded" to Husband and "ordered [Husband] to maintain a life insurance policy" with Wife as beneficiary in the amount of the judgment until it "has been paid in full, plus interest."

¶57    But the trial court also granted Husband the discretion to "pay this judgment all at once or in monthly installments for a period of time." While no minimum payment was specified, the court provided that if Husband chose to make monthly payments, within "30 days after the amended decree of divorce" Husband shall begin "equal monthly payments, and the duration of such monthly installment payments shall not exceed a period of ten years," whereupon "the balance shall be paid to [Wife] in one final balloon payment." It also ordered that Husband was free to "terminate monthly payments at any time and pay the balance awarded to [Wife] early, with no penalty for early payment."

¶58    Wife argues that it is inequitable for Husband to receive "full immediate enjoyment of the assets awarded to him" as well as "the full use of Wife's share of the assets" while Wife is deprived of meaningful access to her award. Wife also asserts that the judgment more closely resembles a loan or forbearance to Husband than a true judgment because it is not enforceable immediately and that Husband can simply treat it as if it were a loan at a very favorable interest rate, providing him with an obvious incentive to pay minimal installments for the entire installment period. Consequently, Wife contends that the interest rate should be 10%, the "legal rate of interest for the loan or forbearance of any money," pursuant to Utah Code section 15-1-1.[11]

---

11. Utah Code section 15-1-1(1) explains how interest rates regarding lawful contracts "for the loan or forbearance of any money, goods, or chose in action" are to be determined. Utah Code Ann. § 15-1-1(1) (LexisNexis 2013). Section 15-1-1(2) further states that "[u]nless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." *Id.* § 15-1-1(2).

¶59 On its face, the amount of the judgment (half of the asset valuation) appears to be equitable. The terms by which Wife's property settlement is to be paid, however, are not equitable. *See Boyer v. Boyer*, 2011 UT App 141, ¶ 8, 259 P.3d 1063 (stating that we will disturb a trial court's property division "only if," among other things, "such a serious inequity has resulted as to manifest a clear abuse of discretion" (citation and internal quotation marks omitted)). As Wife points out, Husband has been awarded the parties' three parcels of real estate (the Home Parcel, the Bicknell Lot, and the Richfield Parcel) and the two businesses (the Travel Plaza and Milton's South), all of which he has full enjoyment of from the date of the decree. In addition, he is given nearly complete discretion regarding the payment to Wife of her share of the marital property over a ten-year period via a judgment carrying a very low interest rate. Wife, on the other hand, has been granted a substantial judgment in token of her share of the marital real property that she has no ability to collect, access, or substantially enjoy until ten years pass, unless Husband decides otherwise. Indeed, Wife's award is subject to Husband's plenary discretion regarding the amount of monthly payments and how quickly the property award will be paid in full. For example, under the terms of the judgment as we read it, Husband could conceivably make Wife equal monthly payments of $1 for nine years and eleven months before making the final balloon payment to Wife, thereby forcing Wife to wait ten years before realizing any real benefit from her property award.

¶60 Furthermore, we think Wife is correct that the interest rate on the unpaid portion of the judgment provides very little incentive for Husband to substantially pay it prior to the expiration of the ten-year period, much less for him to pay Wife sizeable monthly installments. The meager 2.13% interest rate would almost certainly allow Husband to invest Wife's money elsewhere and reap the benefit of any additional increment of interest—a benefit that in fairness should accrue to Wife herself. We have been unable to find authority to specifically support the

10% interest rate that Wife urges, and Wife offers no cases to support the propriety of imposing the statutory rate on a marital property award. Nevertheless, we think there is some merit to Wife's contention that, in practical application, the court's structuring of the award creates a forbearance (in effect a loan to Husband) without appropriate compensation or benefit. In fact, the restrictions on payment of the judgment, accompanied by the low rate of interest, appear to effectively reduce its value as the years pass with low payments. Certainly, a court has the ability to make equitable provisions for deferred compensation in the context of the property division in a divorce proceeding. *See Pope v. Pope*, 589 P.2d 752, 754 (Utah 1978) (concluding, first, that a higher interest rate than statutorily allowed may be equitably imposed where, "under the circumstances, that award is reasonable," and, second, that an increase of 2% over the statutory interest rate imposed on the amount not paid to the receiving party within six months was not an abuse of discretion); *cf.* Utah Code Ann. § 15-1-1 (LexisNexis 2013) ("Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum."). *See generally Argyle v. Argyle*, 688 P.2d 468, 472 (Utah 1984) (discussing that in cases where one party has been granted current use of the other party's award, it is not an abuse of discretion for a trial court to impose interest on the unpaid portions of a party's award).

¶61    Finally, an important consideration underlying property awards is to allow the respective party to "go forward with his or her separate life." *See Boyer*, 2011 UT App 141, ¶ 10; *see also Argyle*, 688 P.2d at 471 ("It is the court's duty to make a division of the property and income in a divorce [proceeding] so that the parties may readjust their lives to the new situation as well as possible."). And while the life insurance policy and the lien enhance the likelihood that Wife will eventually be able to collect her judgment, they also increase Husband's incentives to pay the

bulk of the award prior to the expiration of the ten-year period only a little; and neither will actually result in an earlier payout unless Husband dies or attempts to sell his property within the next ten years. We note that the trial court had previously found in its alimony determination that Husband and the businesses are "heavily in debt" and that the trial court ordered Husband to bear those debts. But we think the overall dynamics of the court's award more readily allow Husband, with his immediate ability to use and enjoy the property awarded to him and to configure payment of Wife's judgment to his advantage, significantly more latitude to "go forward with his . . . separate life" than Wife is afforded. *See Boyer*, 2011 UT App 141, ¶ 10.

¶62 Based on the foregoing, we conclude that the terms of Wife's property judgment are inequitable and that the trial court exceeded its discretion by structuring the terms of Wife's property judgment as it did. We remand for reconsideration of the terms of Wife's property judgment and for entry of an award that more equitably achieves the goals of marital property division under the circumstances.

### III. The Sunglow Property

¶63 Wife essentially challenges the trial court's decision that the Sunglow Property was not part of the marital estate subject to division between the parties. First, Wife argues that the trial court erred in determining that Husband had not fraudulently conveyed the Sunglow Property. Second, Wife argues that whether or not there was a fraudulent conveyance, the trial court erred by not including the Sunglow Property in its valuation and division of the marital property and requests that we "remand[] with instructions to find the December 2009 value of the property, and to adjust the property division accordingly." A trial court is entitled to a presumption of validity in its assessment and evaluation of evidence, *see Turner v. Turner*, 649 P.2d 6, 8 (Utah 1982), and "[w]e defer to the trial court in its findings of fact related to property valuation and distribution"

unless they are clearly erroneous, *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 44, 176 P.3d 476. However, a challenge that "involves a review of the trial court's application of statutory requirements to factual findings . . . is a mixed question of law and fact." *Clark v. Clark*, 2001 UT 44, ¶ 14, 27 P.3d 538. In such cases, "a trial court's findings of fact will not be reversed unless they are clearly erroneous, and the trial court's application of the statute to those findings will not be reversed absent an abuse of discretion." *Id*.

¶64 While we affirm the trial court's fraudulent conveyance analysis, we remand for the court to reconsider its conclusion that the Sunglow Property was not marital property.

A. The Fraudulent Conveyance Claim

¶65 Under the Uniform Fraudulent Transfer Act (UFTA), if the property transferred fits the definition of an "asset," and if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor or debtor; or without receiving a reasonably equivalent value in exchange for the transfer or obligation," the transfer will be considered fraudulent.[12] Utah Code Ann. § 25-6-5(1)(a)–(b) (LexisNexis 2013). Section 25-6-5 lays out several factors to be considered in assessing whether a debtor conveyed an asset "with actual intent to hinder, delay, or

---

12. "[P]roperty of a debtor" is an asset whose "transfer" is subject to a creditor's fraudulent conveyance challenge under UFTA, except "to the extent it is encumbered by a valid lien." *See* Utah Code Ann § 25-6-2(12) (LexisNexis 2013) (defining "transfer"); *id.* § 25-6-2(2)(a) (defining "asset"); *id.* § 25-6-2(6) (defining "debtor); *id.* § 25-6-2(4) (defining "creditor"). A "[v]alid lien" is a lien "that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." *Id.* § 25-6-2(13). The trial court determined that Husband was a "debtor" and Wife a "creditor."

defraud any creditor or debtor." These include, among other things, whether "the transfer or obligation was to an insider"; whether "the debtor retained possession or control of the property transferred after the transfer"; whether "the transfer or obligation was disclosed or concealed"; and whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." *Id.* § 25-6-5(2)(a)–(c), (h).

¶66   The trial court determined that Husband's sale of the Sunglow Property to his parents in 2011 (after the bifurcated decree but before the trial) did not meet the requirements for a fraudulent conveyance under UFTA. In particular, the trial court found that the property "was [fully] encumbered by a valid lien because there was a promissory note from [Husband] to his parents, which was presumably secured by a deed of trust." The court then determined that the existence of this valid lien meant that the Sunglow Property was not an asset under section 25-6-2. The court reasoned that even if the Sunglow Property were an asset under UFTA, "the evidence simply does not convince the [c]ourt [that Husband] transferred the property with intent" to defraud Wife under section 25-6-5(2) "or without receiving a reasonably equivalent value in exchange."

¶67   Wife argues that the trial court's fraudulent conveyance analysis was infirm because the trial court presumed, without evidence, that the Sunglow Property was encumbered with a valid lien, and she contends that the trial court did not adequately assess whether the property was transferred for a "reasonably equivalent value." She asserts that we should remand "with instructions to reevaluate the fraudulent conveyance action" based on those alleged infirmities. However, we conclude that even if the facts underlying the trial court's "valid lien" assumption are more complicated than the trial court's findings suggest, Wife has not demonstrated on appeal that the trial court erred in its alternative conclusion that even if

the Sunglow Property amounted to an "asset" under UFTA, the transfer did not meet the Act's criteria for a fraudulent conveyance. In particular, Wife has not carried her burden of showing that the court's findings that Husband had no actual intent to defraud and that the sale was for reasonably equivalent value are clearly erroneous. *See State v. Nielsen*, 2014 UT 10, ¶ 41, 326 P.3d 645. As above, *see supra* ¶¶ 19–20, Wife again simply fails to acknowledge the evidence that supports the court's findings and conclusions, much less make any attempt at dealing with them. *Id.*

¶68   The trial court found that, "even if the Sunglow [Property] could be considered a proper asset under" UFTA, "the evidence simply does not convince the [c]ourt [that Husband] transferred the property with the actual intent to hinder, delay, or defraud [Wife], or without receiving a reasonably equivalent value in exchange." The court addressed the relevant UFTA factors and made a number of findings regarding whether a transfer was made with actual intent to defraud. The court determined that several factors supported an inference of fraudulent intent—for example, "the transfer was to insiders" and Husband "still retains control to use the property whenever he wants"—but that other factors weighed against such a conclusion, including findings that "the transfer was only a small part of [Husband's] assets" and that there was "no evidence to indicate . . . that as a result of the transfer, [Husband] became insolvent." And with respect to the question of whether the conveyance had been for reasonably equivalent value, the court also weighed the evidence for and against, noting that "the value of consideration received for the transfer is fairly debatable," as "[t]here is evidence to suggest it was unreasonable and evidence to suggest it was reasonably equivalent." But the court ultimately concluded that "the quantum of [the conflicting] evidence" balanced out and that, as a result, Wife "failed to meet her burden to convince the [c]ourt

by [a] preponderance of the evidence" that Husband's transfer of the Sunglow Property to his parents was fraudulent.

¶69  Wife again does not marshal the evidence supporting the trial court's findings or attempt to show that the evidence supporting them was legally insufficient. Nor does she engage with the reasoning behind the trial court's ultimate conclusion that the property had not been fraudulently conveyed. Instead, she merely makes conclusory assertions regarding what the court should and should not have focused on when it evaluated the transfer and, in so doing, essentially asks us to reweigh the evidence presented to the trial court. For example, she does not address the court's actual intent findings at all. She merely states that "the trial court . . . focused on Husband's good faith or lack thereof in making the transfer" when it "should have found the transfer fraudulent based on the failure to receive reasonably equivalent value," and she asserts that the trial court "was required to find the value of the Sunglow [P]roperty" and erred when it failed to do so. Further, the only evidence Wife points us toward regarding the property's reasonable value is an appraisal she submitted to the trial court that "placed the value [of the property] at $198,000," significantly in excess of the $50,000 sale price.

¶70  But this is not sufficient to meet Wife's burden of demonstrating that the evidence did not support the trial court's findings. As discussed previously, *see supra* ¶¶ 19–20, when a party challenges a finding of fact on appeal, the appellant must "demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." *Ostermiller v. Ostermiller*, 2010 UT 43, ¶ 20, 233 P.3d 489 (citation and internal quotation marks omitted).

¶71  Here, while Wife suggests that the trial court should have focused on the reasonable value issue rather than Husband's good faith and points us toward an appraisal completed in 2007 that indicated the value of the property several years prior to the

transfer was $198,000, she has ignored the other evidence that might have supported the trial court's findings regarding Husband's actual intent or the property's reasonable value. In particular, it is still not enough to simply point toward the piece of evidence she submitted during trial that might support her argument that the trial court's assessment of the property's reasonable value was incorrect. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 21, 217 P.3d 733 ("The marshaling requirement is not satisfied if parties . . . simply rehash the arguments on evidence they presented at trial."). Rather, our review of the record indicates that the trial court was also provided with evidence that suggested a large range of what the property might have been worth in 2011. For example, the trial court was provided another appraisal by Wife completed after the economic collapse and Husband's own financial difficulties that suggested the value of the property was significantly less than $198,000. There was also testimony presented at trial that due to the "economic times and land-locked position of this property in relation to the total property," the $50,000 value was fair in 2011. And evidence was presented by Husband during trial that the property might have been worth considerably less than $50,000 due to its predominantly nonirrigated state. All of this supports the trial court's assessment that there was evidence supporting multiple valuations and that, given the quantum of evidence, the conflicts evened out. Thus, Wife had not met her burden to show that the $50,000 selling price was not reasonably equivalent to the property's value. Wife has failed to marshal this evidence on appeal, let alone demonstrate that this evidence was legally insufficient to support the trial court's findings regarding the value of the property. Consequently, to the extent Wife asks us to reweigh the evidence presented to the trial court, we decline to do so. Because Wife has not demonstrated "that the trial court's findings lack evidentiary support," we will "defer to the trial court's advantaged position to weigh [the] evidence." *See High Desert Estates LLC v. Arnett*, 2015 UT App 196, ¶ 12, 357 P.3d 7 (citation and internal quotation marks omitted).

¶72    Furthermore, Wife's failure to deal with the supportive evidence is not countered by her assertion that under UFTA, the trial court was required to make an express finding as to the property's value. Wife fails to explain why the trial court was required to do so. Certainly, the statute itself does not require that a court must expressly determine the property's actual value in order to conclude that the amount paid and the value were reasonably equivalent. Rather, given the conflicting evidence, the court's determination that Wife had not shown the $50,000 sale price to be significantly less than what the property was actually worth appears to be a sufficient conclusion as to its reasonable value. *See Anderson v. Thompson*, 2008 UT App 3, ¶ 19, 176 P.3d 464 ("The trial court [is] in the best position to consider the conflicting evidence . . . , and we defer to its findings.").

¶73    Thus, Wife has failed to persuade us that the trial court erred in its determination that Husband's 2011 sale of the Sunglow Property to his parents did not amount to a fraudulent conveyance under UFTA.

B.    The Sunglow Property as Marital Property

¶74    Wife argues that, regardless of whether the Sunglow Property was fraudulently conveyed, the trial court erroneously failed to include the Sunglow Property in its marital property division even though it was "marital property Husband retained in the post-divorce property division." She contends that "[b]ecause the asset was owned by the parties at the time of the divorce and its benefits were retained by Husband, the dollar value of Husband's share of the marital property should have been increased by the value of that asset." She asserts that we should "remand[] with instructions to find the December 2009 value of the property, and to adjust the property division accordingly." We agree with Wife.

¶75    The trial court determined that "all real property" owned by either party at the conclusion of the marriage "should be

considered marital property, subject to equitable distribution." The Sunglow Property had been acquired in 2001 and, at the time of the 2009 bifurcated decree, was still held in Husband's name. Nevertheless, at the conclusion of its UFTA analysis, the trial court stated that it "decline[d] to void the [2011] transfer, and does not consider the Sunglow [Property] in determining equitable distribution of marital assets." It is unclear why the court did not consider the Sunglow Property as part of the distributable marital property, even in light of its determination that Husband had not fraudulently conveyed it.

¶76 The court found that Husband bought the Sunglow Property in October 2001, during the parties' marriage, and sold the parcel back to his father "in 2011, after the bifurcated divorce." Thus, per the trial court's own findings, regardless of whether the property was conveyed in 2011 (fraudulently or not), Husband owned and controlled the Sunglow Property as of the date of the divorce decree in December 2009. Because the "marital estate is evaluated according to the existing property interests at the time the marriage is terminated by the decree of the court," *see Fletcher v. Fletcher*, 615 P.2d 1218, 1222–23 (Utah 1980), and because the trial court in this case specifically found that "all real property should be considered marital property," we cannot avoid the conclusion that the trial court erred by failing to include the Sunglow Property as a component of the parties' marital property subject to valuation and equitable distribution as of the date of the bifurcated decree of divorce, *see Henshaw v. Henshaw*, 2012 UT App 56, ¶ 16, 271 P.3d 837 ("Marital property is ordinarily all property acquired during marriage and it encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived." (citation and internal quotation marks omitted)). It is possible the trial court had a legitimate basis to omit the parcel from its division of the marital estate. For instance, the court may have concluded that its value was entirely offset by debts or encumbrance at the time of the

divorce—there was testimony at trial that in 2007 the property was used as collateral to secure financing to build Milton's South. Absent adequate factual findings, however, we are unable to discern the basis for the court's decision not to count the Sunglow Property as marital property subject to division. Consequently, on remand the trial court should reconsider and more fully explain its determination that the Sunglow Property was not marital property subject to equitable division as of December 2009.

¶77 In sum, because Wife has not carried her burden of persuasion on appeal, we affirm the trial court's fraudulent conveyance conclusions. However, we remand for the trial court to reconsider its determination that the Sunglow Property was not marital property subject to equitable distribution.

IV. Temporary Support Order

¶78 Wife argues that "the trial court abused its discretion [by] failing to enforce its temporary support order." "The abuse of discretion standard . . . applies to our review of the district court's temporary orders." *Tobler v. Tobler*, 2014 UT App 239, ¶ 11, 337 P.3d 296.

¶79 When the parties divorced in 2009, they stipulated to temporary orders chiefly because the parties' incomes had not yet been established. At that time, Husband was required to pay Wife $3,500 a month for support, though "the parties reserved the right to 'retroactively adjust' [Husband's] support payment[s]" once their respective incomes were established. The trial court found that Husband "did fairly well with his family support payments" until March or April 2011 at which point Husband stopped making the temporary support payments because "he believed he could no longer afford to pay them." Husband filed a motion in April 2011 seeking relief from the temporary support order, but this issue was not addressed again until the trial. At trial, Wife asked "the [c]ourt to award her a

judgment for delinquent support in the amount of $111,288 plus interest at 10% from January 1, 2014." The trial court denied her request, determining that there was "unusual history surrounding the stipulated temporary [support] orders" and that Husband "did promptly attempt, by motion, to have the obligation adjusted when he faced unusual financial problems." The trial court also stated that it was "not convinced [Husband] lived a particularly lavish lifestyle during the time period at issue" and that it appeared "from the evidence at trial" that Husband "did his best, and only after encountering unusual financial difficulties which made it difficult for him to continue his payments, did he request relief from the Court." Also, the trial court found that "the respective incomes of the parties ha[d] never been properly developed or decided" until the trial. Because "a great deal of water ha[d] flowed under the bridge" since the temporary order was granted in 2009, the trial court "decline[d] to go backward and retroactively award judgment."

¶80   While we think the trial court undoubtedly considered the parties' financial needs and abilities to pay when it declined to retroactively award judgment, we conclude that the court's factual findings and analysis of this issue suffer from the same deficiencies as the alimony determination. The considerations that would have been pertinent to the eventual alimony award were also pertinent to an assessment of temporary support orders: at a minimum, the trial court needed to make more detailed findings regarding the parties' respective needs and abilities to pay during the pertinent period. *See McPherson v. McPherson*, 2011 UT App 382, ¶ 23, 265 P.3d 839. And although it is not an abuse of discretion to refuse to impose a temporary support obligation that is "mathematically impossible for [Husband] to pay," *see id.*, the trial court did not make sufficient findings to show that the circumstances weighed against enforcing a retroactive award.

¶81　In addition, we question the evidentiary basis on which the trial court made its decision. The trial court determined that even though Husband did not live a "particularly lavish" lifestyle between 2011 and 2014, Husband nonetheless did not have the ability to pay retroactive support. But the trial court had previously determined in its alimony findings that at the time of trial Husband "ha[d] roughly the same standard of living" as he had during the parties' marriage. It also found that owing to the "entanglement of [Husband's] business and personal finances, . . . the amount [Husband] claims for purposes of personal income taxes and expenses may not accurately reflect the financial assets at [Husband's] disposal" and that, conversely, Wife "struggles to get by" and was dependent on loans and family members. It is unclear what evidence led the trial court to determine, on the one hand, that Husband had the same living standard he had enjoyed during the marriage and might possibly have access to additional assets and resources not claimed on taxes but, on the other hand, that Husband "did his best" when he stopped making his family support payments owing to his "unusual financial difficulties." We do not conclude that the court had no basis for its determinations, but without more detailed findings or reference to specific evidence from which these seemingly disparate conclusions were drawn, we are unable to discern whether the trial court abused its discretion or not. *See Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 24, 176 P.3d 476. We therefore remand to the trial court to make sufficient findings to support its determination regarding retroactive temporary support. We again note that the trial court is free on remand to reassess the evidence and reach a conclusion contrary to that reached previously if it determines the evidence supports it.

## V. Motion to Reconsider

¶82　Wife argues that the trial court abused its discretion when it denied the Motion to Reconsider. "[W]e review the trial court's

denial of the motion to reconsider under an abuse of discretion standard. Under this standard, the trial court's ruling may be overturned only if there is no reasonable basis for the decision." *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 16, 163 P.3d 615 (citation and internal quotation marks omitted).

¶83 The trial court issued its memorandum decision on June 23, 2014, and stated that it was "a final Order and Judgment" and that "[n]o additional order [was] necessary or required." The decision also directed counsel for Husband to "draft the final documents necessary to implement the [c]ourt's decision." Wife filed a notice of appeal of the memorandum decision and order on July 23, 2014, clarifying that although she did not consider the order to be final, she was "filing [the] notice of appeal out of an abundance of caution." Wife then filed the Motion to Reconsider and the Objections to the decision on August 15, 2014. On September 16, 2014, the trial court entered its supplemental findings of fact and conclusions of law and also entered a memorandum decision order denying Wife's Motion to Reconsider and overruling the Objections. The trial court gave three reasons for this decision. First, the trial court stated that it "certified its 23 June 2014 Memorandum Decision as a final order ready for appeal" and that Wife's "remedy is to appeal," particularly because "[m]otions to reconsider final orders are not recognized by Utah's rules," citing *Gillett v. Price*, 2006 UT 24, 135 P.3d 861, for support. Second, the trial court stated that "because [Wife] filed a notice of appeal, [it] no longer ha[d] jurisdiction to make the sweeping changes [Wife] demand[ed]." Finally, the court stated that it "[stood] by its decision and decline[d] to reconsider" whether "the Findings of Fact and Conclusions of Law and Supplemental Decree of Divorce and Judgment submitted by counsel for [Husband] accurately reflect the ruling of the [c]ourt's Memorandum Decision" and that Wife's "objection to these documents is overruled." Wife then timely filed another notice of appeal on October 10, 2014.

¶84    Wife contends that "[t]he trial court denied [her] motion out of hand" and did not "even consider [it]" and that the court's reasons for doing so were based on a mistake of law because the court considered the initial memorandum decision to be a final order when it was instead an interlocutory order. Wife argues that the Motion to Reconsider and the Objections should rather be considered a rule 54(b) motion under the Utah Rules of Civil Procedure and that the trial court abused its discretion when it summarily denied her motion. Husband argues that because Wife filed a notice of appeal on July 23, 2014, the trial court lost jurisdiction to consider the later-filed Objections or, in the alternative, that the trial court did consider her arguments and simply chose to stand by its decision.

¶85    We agree with Husband that the trial court did not summarily deny Wife's motion. The trial court stated that one of the reasons it denied the motion was because it "[stood] by its decision" and that it overruled the Objections because it found that the documents submitted by Husband subsequent to the court's memorandum decision "accurately reflect[ed] the ruling" the court had made. The court also explained that "[Wife] disagrees with nearly every aspect of the [c]ourt's decision," which suggests to us that the court reviewed the substance of the Motion to Reconsider and the Objections prior to making its decision. Thus, even though the trial court did not provide a detailed analysis, it seems clear enough that the court at least considered the merits of the Motion to Reconsider and the Objections before denying and overruling them.[13] As a consequence, we view Wife's claim that the court abused its discretion by failing to properly consider the Motion to Reconsider to be without merit.

---

13. Because we are remanding the case for reconsideration of several of the issues Wife raised in the Motion to Reconsider and the Objections, we do not reach Wife's other arguments.

VI. Attorney Fees

¶86    Finally, Wife argues that the trial court erroneously denied her request for attorney fees. "Both the decision to award attorney fees and the amount of such fees are within the sound discretion of the [trial] court." *Morgan v. Morgan*, 854 P.2d 559, 568 (Utah Ct. App. 1993) (citation and internal quotation marks omitted). We will disturb the trial court's decision regarding attorney fee awards only if the trial court abused its discretion, *see Valcarce v. Fitzgerald*, 961 P.2d 305, 316 (Utah 1998) (plurality), or the findings are insufficiently detailed to allow appellate review, *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶¶ 50–52, 176 P.3d 476.

¶87    A trial court "may order a party to pay the costs [and] attorney fees . . . of the other party" in a divorce proceeding. Utah Code Ann. § 30-3-3(1) (LexisNexis 2013). It must base its decision on specific findings regarding "'evidence of the financial need of the receiving spouse, the ability of the other spouse to pay, and the reasonableness of the requested fees.'" *Stonehocker*, 2008 UT App 11, ¶ 49 (quoting *Oliekan v. Oliekan*, 2006 UT App 405, ¶ 30, 147 P.3d 464). "[F]ailure to consider these factors is grounds for reversal on the fee issue." *Id.* (citation and internal quotation marks omitted). In this case, the trial court surmised that the "parties have likely incurred significant attorney[] fees" and that Wife "is likely in need of assistance." Nonetheless, the trial court determined that "[Husband] does not have sufficient remaining resources to assist [Wife]" with her attorney fees and ordered "the parties [to] each . . . bear their own costs and attorney[] fees."

¶88    Again, the trial court's determination lacks "detailed written findings of fact" sufficient "to afford this court an opportunity for meaningful review." *See Id.* ¶¶ 50, 53. Rather, the court's decision is conclusory regarding Wife's "likely" need and Husband's insufficient financial resources. We recognize that there were findings from other sections—particularly the

alimony findings regarding Husband's ability to pay and Wife's need—that the trial court might have adopted and incorporated into its assessment here. *See id.* ¶¶ 50–51 (recognizing that even though the trial court did not make express findings as to the financial need of receiving spouse, the ability of the other spouse to pay, and the reasonableness of the requested fees, "there [were] facts [from] other sections of the findings and conclusions that could support the award," particularly the alimony section, but still remanding for the trial court to enter express findings as to those factors). But we have already concluded that the trial court's alimony findings were themselves insufficient. *See supra* Part I.B.

¶89 Moreover, because we are remanding the case for consideration of similar questions regarding Wife's need for support and Husband's ability to pay in the alimony context, it makes sense that the trial court should reconsider the attorney fees request once those alimony findings are made. *See supra* Part I.B. While the determinations of need and ability to pay may not always exactly correspond in the alimony and attorney fees contexts, we think they are related enough that it makes sense for the court to reassess its attorney fees determination after it has readdressed its alimony determination. Accordingly, we remand for the trial court "to enter express factual findings related to the award of attorney fees that include findings on the financial need of the receiving spouse, the ability of the other spouse to pay, and the reasonableness of the requested fees" once it has entered similarly "express factual findings" regarding Wife's need for support and Husband's ability to pay in the alimony context. *See Stonehocker*, 2008 UT App 11, ¶ 51 (internal quotation marks omitted).

## CONCLUSION

¶90 In sum, we affirm in part and reverse in part. Regarding alimony, we affirm the trial court's determination regarding

Husband's income but remand for the trial court to make findings regarding Wife's needs and Husband's ability to pay. For the property valuation, we affirm the trial court's determinations as to the value of the two businesses, the business debt, and the Mercury Sable, but we remand for the trial court to reevaluate its determinations regarding the business inventory and the water shares. We remand the case for the trial court to reconsider the equities in the terms of its order regarding payment of Wife's property judgment. Regarding the Sunglow Property, we affirm the trial court's fraudulent conveyance conclusions, but we remand for the trial court to reassess whether the Sunglow Property should be included as marital property, subject to equitable division. Finally, we affirm the trial court's denial of the Motion to Reconsider, but remand for more sufficient findings regarding its temporary support and attorney fees conclusions.

_____