**2022 UT App 103**

## THE UTAH COURT OF APPEALS

LISA PETERSON LABON,
Appellee,
*v.*
PIOTR ARKADIUSZ LABON,
Appellant.

Opinion
No. 20200547-CA
Filed August 18, 2022

Third District Court, Silver Summit Department
The Honorable Kent R. Holmberg
No. 174500142

Julie J. Nelson, Alexandra Mareschal, and Jaclyn Jane
Robertson, Attorneys for Appellant

Karra J. Porter and Kristen C. Kiburtz, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

MORTENSEN, Judge:

¶1      During Peter[1] and Lisa Labon's marriage, Peter generated a significant income managing the marital assets. Over the years, the ebb and flow of income was tempered by occasionally leveraging—basically borrowing from—two whole life insurance policies. At trial in the divorce action, Peter maintained that he intended to generate income in the same way after the divorce as

---

1. As is our custom, we refer to the parties by their given names when they share a surname. And in conformity with the other court documents in this case, we employ the anglicized form of Piotr.

he had historically done during the marriage. When the trial court divided the marital assets, and particularly the insurance policies, so that Peter could continue to do so, Peter objected and now appeals, claiming that the way the court divided the assets is not equitable and will cause him to suffer substantial negative tax consequences. On review, we conclude that the trial court did not exceed its discretion and therefore affirm.

BACKGROUND[2]

¶2      Peter and Lisa married in 1995. In the early 2000s, Peter made a lot of money, primarily through investing and the financial industry. Around 2008, he stopped working a traditional job and devoted himself to investing and managing the marital assets, thereby generating the household's income. Lisa was a "full-time stay-at-home wife and mother" throughout the marriage.

¶3      Around 2017, Peter and Lisa experienced irreconcilable differences, and after a twenty-five-year union, they divorced in 2020.

*Division of Property*

¶4      As relevant here, the division of marital assets consisted largely of Peter receiving various financial instruments and Lisa receiving cash.

¶5      **Real Property**: After filing for divorce in the trial court, the parties entered into a stipulation, which the court accepted, for the division of a house in Park City, Utah. The proceeds of the sale of

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Chesley v. Chesley*, 2017 UT App 127, ¶ 2 n.2, 402 P.3d 65 (cleaned up).

the Park City house were split equally, with each party receiving $3,077,000 in cash. Peter used $1,560,000 and Lisa used $1,300,344 to buy individual houses in Park City—properties which the trial court awarded to each as separate property. The parties funded several bank or investment accounts with their "respective remaining proceeds" from the sale of the Park City house. And Lisa used some of her money to establish a business. These assets the court likewise awarded as separate property.

¶6     **Cash**: The parties had $1,643,277 in cash, the bulk of which came from selling a house in Oregon. The court awarded $61,517 to Peter and $1,581,760 to Lisa.

¶7     **Other Property**: The court awarded Peter the parties' $25,000 horse. The parties had already divided a valuable wine collection, numerous vehicles (six going to Peter and two going to Lisa), and other personal property, which the court awarded to the parties as presently held.

¶8     **Life Insurance Investments**: The parties held two whole life insurance policies, which the court awarded to Peter.[3] One

---

3. "Generally speaking, there are two categories of life insurance: whole life insurance and term life insurance. Term life insurance protects the policyholder for a specified period of time. Whole life policies, by contrast, remain in existence throughout the life of an insured. In general, premiums on term insurance policies pay only for the cost of providing the insurance, while at least some whole life policies have some type of participatory investment or savings feature." *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Nos. 12 Civ. 6811(CM)(JCF), 13 Civ. 1580(CM)(JCF), 2014 WL 2199428, at *1 (S.D.N.Y. May 23, 2014); *see also Life insurance*, Black's Law Dictionary (11th ed. 2019) (defining whole life insurance as "[l]ife insurance that covers an insured for life, during which the insured pays fixed premiums, accumulates

(continued…)

policy (Northwestern Mutual) had a cash value of $1,761,224 but was encumbered by a debt of $1,391,687. The other policy (Pacific) had a cash value of $592,931 and was unencumbered.

¶9      During the divorce proceedings, Peter explained how they used the policies to take out loans: "[W]e borrowed money multiple times during our marriage to make other investments. . . . [W]e borrowed money essentially from ourselves because the life insurance policy was ours." And even though they paid interest on the loans from their policies, they "received dividends to counteract that," making the effective interest rate "on these loans . . . 1 percent or less." Even during the divorce proceedings, Peter had paid off a loan against the Pacific life insurance policy. Peter also explained that this leveraging did not incur taxes because the policies were not surrendered. But he pointed out that "if as . . . a result of these proceedings, the decision is made to surrender those policies to get the cash value, there will be a tax liability associated with them."

¶10     When asked how he planned to support himself financially going forward, Peter answered, "Well, . . . essentially the same way as I have in the past. . . . I plan to make similar kinds of investments going forward." He further explained that he was "planning to diversify into other" investment products.

¶11     The court awarded the parties' whole life insurance investments to Peter:

> Given Peter's unilateral decision to pay off the [life insurance] loan, combined with his testimony that he wants to continue to invest in life insurance, the

savings from an invested portion of the premiums, and receives a guaranteed benefit upon death, to be paid to a named beneficiary" and stating "[s]uch a policy may provide that at a stated time, premiums will end or benefits will increase").

Court awards the Pacific Life Insurance policy to Peter.

. . . .

Although the Court finds that [the Northwestern Mutual life insurance policy] and the corresponding loans are both marital, the Court awards the asset to Peter in the equitable division of the parties' marital estate. The Court finds that Lisa did not understand and/or was not given a choice as to whether or not the loans were taken. It is more equitable, therefore, to award the value of the asset and the debt to Peter with an offset to Lisa from another asset.

¶12 **Business Ownership**: The court also awarded the couple's business ownership (worth $741,000) in a hedge fund—which was run by Peter's friend—to Peter. Peter challenged the value of this interest, alleging that a $500,000 loan from his mother enabled him to make the investment in this hedge fund and that this alleged debt was also marital. For context, Peter testified that an earlier incarnation of the hedge fund had produced a 65% return for him in less than two years. And Peter testified that his mother had been earning only 1% on her $500,000 in the way she had it invested, but he offered to invest it for her and give her a 4% return because he would be earning an even greater return on the money invested in the hedge fund. Alternatively, Peter argued that even "if the court [did] not accept his contention that there [was] a $500,000 loan," the hedge fund "investment was purchased with this $500,000 from his mother" and thus "should not be considered marital property."

¶13 In contrast, Lisa testified that "she was led to believe, by Peter, that he was investing his mother's money *directly into* [the hedge fund]—not that they would be borrowing from Peter's mother and investing directly themselves." Rather, she explained that it was her understanding that Peter "was adding his mother

to [the hedge fund] as a separate investment." Lisa maintained that the only discussion was that Peter was "going to get his mother in on the investment," not a discussion that "he was going to take his mother's money, put it in that investment, and try to profit off of his mother's capital." Accordingly, Lisa's testimony was that the investment in the hedge fund was their own, not anyone else's.

¶14 The court found that Lisa's testimony was "more credible than [Peter's] on this issue." The court observed that there was "no promissory note or other evidence of this loan," that "[n]o documentary evidence of this transaction was presented at trial," and that "only . . . Peter's testimony" supported the transaction. It also noted that Peter's mother had not testified about the loan. Thus, the court rejected Peter's arguments because (1) "Peter did not present evidence to substantiate this claim other than his own testimony," (2) the investment was titled in Peter's name, (3) Peter had not established that the "asset [was] actually in Peter's mother's name," and (4) "Peter did not present evidence tracing the receipt of any money from his mother and the investment of the same sum into" the hedge fund. The court observed,

> Without some documentary evidence to support this series of transactions, and given the amount of the sum in question, the court does not find this argument persuasive. The credible evidence presented at trial supports the court's findings that the [hedge fund] investment is a marital asset and the alleged loan from Peter's mother has not been established nor traced to the [hedge fund] investment.

In short, the court concluded that Peter had "not met his burden of proof to establish that there [was] a marital debt of $500,000" owed to his mother.

¶15    **Equalizing Payment**: After the court divided the marital assets and accounted for offsets, it ordered Peter to pay Lisa an equalizing payment of $192,899.

*Income and Alimony*

¶16    **Income**: The court determined that Peter could earn $250,000 per year or $20,833 per month. It based this determination on his "historical earnings and his income representations" on his investments. Specifically, the court noted that "although the corpus available for him to manage [would] be reduced, this figure [was] still within his stated 4–10% range [of return on his investment assets] and equates to his investment income over 9 years." The court found that insofar as working was concerned, the "highest and best use of Peter's time [was] to continue his work in investing and Peter credibly testified that this was his intention. Based on [Peter's vocational expert's] analysis, Peter [was] earning at least double what he could by going to work for someone else in the financial services industry." The court found Lisa's earning capacity to be $3,743 per month.

¶17    **Alimony**: To maintain the marital standard of living, the court found that Peter's expenses were $29,515 (resulting in a $15,053 monthly shortfall) and Lisa's expenses were $22,314 (resulting in an $18,344 monthly shortfall).[4] To equalize the shortfall, the court determined that equity favored an alimony award to Lisa of $1,646 per month.

*Clarification Hearing*

¶18    After the court issued its findings of fact and conclusions of law, it held a "clarification hearing" to identify any "typographical [errors], errors in computation, or any places

---

4. The court included taxes and adjustments for child support in calculating the shortfalls.

where the parties felt that there needed to be further clarification by the Court in order to properly articulate the decision."

¶19 Peter argued that awarding the cash to Lisa and the investments to him left him in a position that would force him to sell both policies to maintain liquidity for his future investments. Peter also noted that there would be "a substantial tax impact if he" had to sell the policies. Peter was "concerned" that for him to continue to invest, he would be subject to "a huge tax loss that [was] not factored into his side of the equation."

¶20 Lisa responded that Peter was going beyond the scope of the hearing to mount an "informal appeal" by attacking the findings of the trial court. She pointed out that Peter made clear during his testimony that he wanted to continue "to invest in life insurance" and "that's what [the court] gave him." She further pointed out it was clear that while investing in life insurance could produce "potentially taxable" events "depending on what [Peter did] with" the insurance policies, "there was no testimony with respect to any specifics" for the court to make any findings on the tax implications of the division, especially given Peter's desire to keep the insurance assets.

¶21 Subsequently, in its final decree of divorce, the court stated that it could not make any finding about the tax implications of liquidating assets because no credible evidence had been presented on the matter:

> There was no credible evidence to permit the court to make any findings as to the tax effect of liquidating any specific asset or even that any specific asset would be liquidated. To meet liquidity needs during the marriage, the parties liquidated some assets and also leveraged the assets they had. It is unclear to the court whether Peter will need to liquidate assets or leverage assets to satisfy his liquidity needs.

¶22    Peter now appeals.

ISSUE AND STANDARD OF REVIEW

¶23    Peter contends that the trial "court erred when it divided the estate, awarding Lisa all the parties' cash plus alimony, and Peter the parties' investments, an equalizing payment [owed to Lisa], and an alimony obligation, without considering liquidity, risk, tax consequences, or other obligations." "District courts have considerable discretion concerning property distribution in a divorce and we will uphold the decision of the district court unless a clear and prejudicial abuse of discretion is demonstrated." *Gerwe v. Gerwe*, 2018 UT App 75, ¶ 8, 424 P.3d 1113 (cleaned up).

ANALYSIS

¶24    Peter now argues that the trial court's division of assets constitutes an abuse of discretion because it should have been "obvious" to the court that a "consequence" of its ruling was that Peter would be forced "to liquidate assets *immediately* to even pay the equalization payment" to Lisa because the distribution left him with negative cash and her with nearly $1,800,000 in cash. Due to his alleged dearth of cash, Peter argues that the court's division left him "necessarily" having "to liquidate investments" not only to pay the equalization but "to pay alimony and make up his own spending deficit." Thus, Peter argues that the court should have anticipated "the immediate and foreseeable consequences of a property distribution—consequences that [would] fall like dominos as a direct result of the property distribution itself."

¶25    When rendering a decree of divorce, the court is expected to include "equitable orders relating" to the division of "property, debts," and "obligations." Utah Code Ann. § 30-3-5 (LexisNexis

Supp. 2021). In making this division, the "court should engage in a four-step process": (1) "distinguish between separate and marital property," (2) "consider whether there are exceptional circumstances that overcome the general presumption that marital property should be divided equally between the parties," (3) "assign values to each item of marital property," and (4) "distribute the property in a manner consistent with its findings and with a view toward allowing each party to go forward with his or her separate life." *Taft v. Taft*, 2016 UT App 135, ¶ 33, 379 P.3d 890 (cleaned up).

¶26     And in making the equitable distribution, the court should "generally" consider "the amount and kind of property to be divided." *Burke v. Burke*, 733 P.2d 133, 135 (Utah 1987). As concerns the type of property, "[i]n situations where the marital estate consists primarily of a single large asset, such as a business or stock, a common acceptable approach for the court to take is to award the asset to one party and make a cash award to the other party." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 79, 507 P.3d 385, *petition for cert. filed*, May 6, 2022 (No. 20220412). Doing so avoids the obviously undesirable situation that forces former spouses "to be in a close economic relationship which has every potential for further contention, friction, and litigation, especially when third parties having nothing to do with the divorce will also necessarily be involved." *Argyle v. Argyle*, 688 P.2d 468, 471 (Utah 1984) (cleaned up).

¶27     Moreover, a court should consider the "tax consequences" associated with the division of marital property if one of the parties "will be required to liquidate assets to pay marital debts." *Morgan v. Morgan*, 795 P.2d 684, 690 (Utah Ct. App. 1990). But the court is under "no obligation to speculate about hypothetical future tax consequences." *Id.* (cleaned up). Thus, "[w]hen settling property matters, the trial court may decline to consider the speculative future effect of tax consequences associated with sale, transfer, or disbursement of marital property." *Id.* at 689. In other

words, "[t]here is no abuse of discretion if a court refuses to speculate about hypothetical future tax consequences of a property division made pursuant to a divorce." *Howell v. Howell*, 806 P.2d 1209, 1213–14 (Utah Ct. App. 1991); *see also Alexander v. Alexander*, 737 P.2d 221, 224 (Utah 1987) (stating that a "trial court's refusal to speculate about hypothetical future consequences" of a taxable event associated with the division of marital property is not, by default, "an abuse of discretion").

¶28 "Application of the foregoing principles of law to the facts of this case prompts the conclusion that the trial court did not abuse its discretion" when it did not explicitly address the tax consequences of the property division in which it awarded the investments to Peter and the majority of the cash to Lisa. *See Burke*, 733 P.2d at 135.

¶29 First, Peter expressed a desire during trial to continue to support himself in largely the same manner as he had been doing during the marriage. It was reasonable for the court to find that Peter would continue to support himself and meet liquidity needs by leveraging the investment assets he was awarded. He had done so in the past, and it was reasonable for the court to accept his assertion that he would continue to do so in the future.

¶30 Second, the tax implications of the property division that Peter raises were entirely speculative as presented to the trial court. In short, nothing in the record indicates that Peter would suffer adverse tax consequences as a result of the property division. Indeed, just the opposite is true: the property division was structured in such a way as to avoid tax consequences by awarding Peter certain investment assets so that he could continue to manage them profitably and would not have to liquidate them.

¶31 Notably, the trial court did not order Peter to liquidate any assets. Nor did Peter offer any evidence that he intended to or would need to liquidate any assets, an action that would trigger a

tax liability. Indeed, Peter spoke of liquidating the assets in question only in hypothetical terms. He said, "*if* as . . . a result of these proceedings, the *decision is made* to surrender those policies to get the cash value, there will be a tax liability." (Emphasis added.) Nowhere did Peter present evidence to the court that he would necessarily have to liquidate assets after the division of the marital estate. Even at the clarification hearing, Peter spoke about tax implications of liquidation in conditional terms.[5]

¶32 "Tax consequences in this case were speculative as to whether they could be avoided or delayed, and as to amount." *See Howell*, 806 P.2d at 1214. And while the "court heard testimony and evidence regarding possible tax implications, [it] did not err in refusing to adjust property distribution because of those theoretical consequences." *See id.*

¶33 In sum, the trial court did not abuse its discretion in refusing to make adjustments related to potential tax consequences resulting from the division of marital property because those consequences were theoretical and speculative.[6]

---

5. We note that Peter repeatedly refers in the record to unspecified tax loss carryforwards from previous years that he had used to offset tax liabilities in subsequent years. Thus, in addition to the tax consequences being wholly speculative, the possible presence of additional tax loss carryforwards further undermines the idea that Peter would necessarily have to surrender the policies to meet his obligations.

6. Peter also appears to challenge the court's factfinding on the existence of the loan from his mother. "But to successfully challenge a trial court's factual finding on appeal, the appellant must overcome the healthy dose of deference owed to factual findings by identifying and dealing with the supportive evidence
(continued…)

CONCLUSION

¶34 The trial court did not abuse its discretion in awarding the investments to Peter and the cash to Lisa, because it was under no obligation to speculate about the possible tax implications associated with that division of property.

¶35 Affirmed.

————————

and demonstrating the legal problem in that evidence, generally through marshaling the evidence." *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (cleaned up). Because Peter has failed to do so, we decline to further consider this aspect of his argument.

Regarding the hedge fund investment, Peter also complains that the trial court assigned Peter "all the risk" when it should have distributed part of the risk to Lisa. Peter's characterization on appeal of the hedge fund as risky does not comport with his testimony at trial, where he explicitly stated, "I feel [it] will be profitable. . . . [It] is likely to be profitable." Far from assigning him all the risk, Peter's own trial testimony appears to have led the trial court to award him an asset that would likely be profitable. Thus, we cannot say the trial court abused its discretion in awarding the hedge fund solely to Peter. *See Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (stating that an appellate court will find an abuse of discretion in an award of property "only if no reasonable person would take the view adopted by the trial court" (cleaned up)).